Wilburn JACKSON, Petitioner-Appellee,

v.

E. B. CALDWELL, Warden, Georgia State Prison, Reidsville, Georgia, Respondent-Appellant.

No. 71–2129.

United States Court of Appeals, Fifth Circuit.

June 13, 1972.

Arthur K. Bolton, Atty. Gen., Dorothy T. Beasley, Asst. Atty. Gen., Harold N. Hill, Jr., Executive Asst. Atty. Gen., Courtney Wilder Stanton, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant.

Robert G. Fierer, Garland & Garland, Edward T. M. Garland, Atlanta, Ga., for petitioner-appellee.

Before JOHN R. BROWN, Chief Judge, and BELL and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The State of Georgia appeals from the district court's grant of habeas corpus relief to Wilburn Jackson, an inmate of the Georgia State Prison, Reidsville, Georgia, where he is confined under a 1959 life sentence for the murder of his wife. In granting the writ, the district court held: (1) the state judge who presided at Jackson's 1959 murder trial should have ordered, *sua sponte*, that a hearing be held concerning Jackson's competency to stand trial; and (2) in this habeas proceeding Georgia failed to establish that Jackson was competent to stand trial on or near his trial date, July 30, 1959. Review of the record leads us to conclude that the court below was in error in its first holding. We reverse the judgment of the district court on that basis.

## I. FACTS

In about mid-May, 1959, the petitioner-appellee, Wilburn Jackson, a black, thirty-two year old rural resident of near Temple, Haralson County, Georgia, following an argument with his wife, Louise Jackson, beat her severely with a claw hammer and a rifle butt. She died later the same day. Jackson buried his wife's body in a field together with linens stained with her blood. A few days thereafter he ploughed the field where the body was and sowed it to field peas. Almost three weeks later, Jackson took a bottle of deodorizer and sprinkled its contents on the ground over his wife's body to prevent odor. The body was discovered and reported to authorities June 5, 1959. He gave Sheriff Allen of Haralson County a long statement that day. The statement, largely self-inculpatory was coherent and calm in tone, if not in content.

The grand jury of Haralson County indicted Jackson for murder in the first degree, a capital offense. Two local attorneys, Robert A. Edwards and E. B. Jones, were appointed to represent him. His jury trial for murder began July 30, 1959, in the Haralson Superior Court before the Honorable W. A. Foster, Jr. The principal defense interposed in Jackson's behalf was that of temporary insanity at the time the alleged murder took place. The jury found Jackson guilty as charged with a recommendation of mercy. Because of the recommendation the trial judge imposed a life sentence. Following the imposition of sentence, Jackson's counsel moved for a new trial. This motion was withdrawn the next day. According to counsel, Jackson's avoidance of the death penalty constituted a victory which should not be jeopardized in a second trial. No appeal was taken from the judgment and sentence.

It should be emphasized that never during the murder trial did counsel for Jackson claim that the accused was incompetent to stand trial. All the testimony introduced by the defense bearing upon Jackson's emotional and mental health was in support of a claim that Jackson was temporarily insane when he killed his wife. Because that testimony is crucially significant to our decision, in the light of Pate v. Robinson, 1966, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, and this Court's en banc ruling in Lee v. State of Alabama, 5 Cir. 1967, 386 F.2d 97, cert. denied 1969, 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 246, we set out pertinent excerpts verbatim.

Mr. William Baskin, Jackson's brother-in-law called as a State witness in the murder trial, testified as follows on cross-examination:

"Q Based on what you know from your observation of this boy over

the years, based on your knowledge of his actions and so forth, do you think he is sane or insane?

A I really don't hardly know how to answer that. I know he didn't act like average people.

Q Repeat your answer to the last question.

THE COURT: Ask the question again.

"Q Based on your experience with Wilburn Jackson and your observation of him over the years, his actions, do you think he is sane or insane?

A Well, my answer was that I know he doesn't act normal, as normal people.

Q Can you testify whether he is sane or insane, do you have an opinion whether he is sane or insane?

A Yes, sir.

Q What is your opinion?

A I would say he is insane."

On re-direct examination Mr. Baskin testified:

"Q From your observation of Wilburn Jackson over a period of years, tell this jury what your opinion is as to whether or not he knows right from wrong.

A Yes, he knows right from wrong until at times when those spells come on him, then he doesn't seem to regard himself or anyone else, just plainly speaking.

Q Those spells, what do they appear to be, fits of temper or what?

A That's right.

Q From your observation is he a person with a violent temper?

A At times.

Q What kind of actions were there when you have seen him manifest that temper?

A Well, probably he would be talking to his father or something,

and something goes wrong, he is all to pieces, and the next time he would be just as fine as he could be.

Q Tell us whether or not he just manifested those fits of temper when what was said was something he didn't like or what was done was something that didn't suit him.

A Well, there wasn't too many of these spells when I was around, but I would just hear them talk, probably I would be in my room and wouldn't be paying any attention and I would hear him blow up all over.

Q When he would blow up what would he do, argue?

A Yes, arguing and walking."

Sheriff L. P. Allen, a witness for the State, testified on direct examination:

"Q Sheriff Allen, how long have you known the defendant, Wilburn Jackson?

A I don't know just exactly, several years.

Q Did you know him when he ran a cafe down there?

A Yes, sir.

Q Had you seen him on many occasions?

A Yes, sir.

Q Between that time and the time that this occurred?

A Yes, sir.

Q Did you talk to him, on those occasions?

A Yes, sir.

Q Did you observe his conversation and actions on those occasions?

A Yes, sir.

Q How long were you with him and when did you first see him after the body of Louise Jackson was found?

A I don't know exactly, it must have been around 10 o'clock, it was some time that morning.

Q And how long were you with him that day? Just tell us the number of occasions.

A I was with him a short time at that time, then later on in the day I came back out here to the jail and then I was with him until at least 10 o'clock that night.

Q During those times was that when the written statement that you read this morning was taken?

A Yes, and afterwards, I was with him several hours after that.

Q Did you go to his father's house when he finally signed the statement?

A I was present when he signed it.

Q During all of that time, and during the time that you knew him prior to this, did you form any opinion as to whether he was sane or insane?

A He was sane.

Q Did you form an opinion, or is there no doubt in your mind that he knew right from wrong?

A No, sir.

Q In your opinion did he positively know right from wrong?

A ɪ am sure he did."

On cross-examination Sheriff Allen testified:

"Q You haven't been around this man a great deal, have you?

A I have been around him several times, E.B.

Q Mr. Allen, if someone wouldn't eat food until they had someone to taste it, would that be out of the ordinary, in your opinion, every time I sat down to the table I wouldn't eat until it was tasted?

A That would be a little out of the ordinary for me.

Q If someone continuously lived in his past instead of looking at the present and the future, would you consider that out of the ordinary?

A I guess it would be.

Q If someone flies into what we call a rage, and started beating on the walls with his hand and fist without any apparent reason, would that be out of the ordinary?

A You want my opinion?

Q Yes.

A It would be just mean.

Q Even though he had no reason to do it?

A That's right."

The following testimony was given by Sheriff Allen on re-direct examination:

"Q Sheriff, in arriving at your conclusion that he knew right from wrong, was there any statement made to you after the giving of this written statement by Wilburn Jackson?

A Yes, when we left the house we came back by Temple and stopped there a while and went from there to Carrollton to the undertaker's, and Wilburn told me he was proud it was over with, proud that we found it out, he hadn't slept three hours at a time, he was glad it was over with.

Q He seemed to be relieved?

A Yes, he seemed more alive after he signed the statement and all. We went to the undertaking parlor at Carrollton and then back to the jail."

The principal witness at the trial on the question of Jackson's mental condition was Dr. Thomas Leland, who testified on direct examination as follows:

"Q You are Dr. Thomas Leland?

A Yes, sir.

Q Where do you live, Doctor?

A Atlanta, Georgia.

Q Are you an M.D.?

A Yes.

Q Are you also what we commonly call a psychiatrist?

A Yes.

Q Doctor, will you tell the jury where you received your medical and psychiatric training?

A I graduated from Emory University School of Medicine in 1953. After my internship I spent two years in psychiatry at St. Elizabeth Hospital in Washington, D. C., and one year after that at the University of Pennsylvania in Philadelphia. I spent two years in psychiatry at the Naval Hospital in Corpus Christi, Texas, and entered private practice in psychiatry in July of this year, in Atlanta, Georgia.

Q What is the name of the place in which you are now practicing?

A I am now practicing at the Atlanta Psychiatric Clinic on 2905 Peachtree Street.

Q Doctor, were you called in the case of The State versus Wilburn Jackson, who is charged with the offense of murder?

A Yes.

Q Have you had occasion to examine Wilburn Jackson, the defendant in this case?

A Yes.

Q When did you first examine him?

A I examined him on three occasions, the first being last Friday, the 24th of this month. I saw him again on Monday and on Wednesday.

Q How long were you able to examine him on each occasion?

A On the first occasion I examined him approximately three and a half hours, the second time, very privately, thirty minutes and again yesterday fifteen or twenty minutes.

Q Now, Doctor, is this an ideal period of time to examine a patient for the purpose of determining his mental condition?

A In most instances, yes, on border-line cases, where there is some evidence of abnormality we usually spend quite a variable amount of time. Usually an hour is the time allotted to it.

Q In other words, if it is just a matter of black and white, whether he is sane or insane, one hour would be sufficient?

A That is the clinical time.

Q What did you find in this case, was this a case of black and white?

A No, this was not a case of out-and-out psychosis.

Q Now, Doctor, in this case, it being what you call a border-line case, did you also have to take other matters into consideration besides your own examination of the patient suffer illness or circumstances surrounding him? (sic)

A I had to talk to his family and other features involved in the case for his history, and also examine documents as to his past medical history.

Q Did you find any documents or documents having any bearing on his past medical history?

A Yes, I saw a photostat of his medical discharge, a letter accompanying his medical discharge from the army in 1946, that he suffered from a mental illness.

Q I will ask you, if I may interrupt, I hand you an original letter and a photostat and ask you if that photostat is the one you examined and if that is a photostat of the original letter which I have just handed to you.

A Yes, both are the documents.

Q Is that the letter that you have referred to from the army?

A Yes.

Q What did you discover from that letter, regarding his mental condition at that time?

A This is essentially a letter concerning the accused, dated March 1946, and of interest to me was

the statement that he had been admitted to the hospital while in the army, and was diagnosed as having a pyschosis, schizophrenic reaction.

Q What is schizophrenic reaction?

A It is a psychiatric condition due to some mental illness, typically suffering from disease and hallucinations, which is usually hearing voices and seeing imaginary visions or delusions, delusions meaning false beliefs.

Q Now, Dr. Leland, I will ask you if a patient or a person was concerned about someone poisoning him, or poisoning his food, would that be a symptom of schizophrenia?

A If it is a false belief, if it was persistent, for instance if he talked about it repeatedly, if it was a persistent belief, a false belief, to the extent that it affected his behaviour, for example if he refused to eat food unless it was tested, that would be an example of delusion.

Q Now, Doctor, if a person were suffering from psychosis, schizophrenic reaction, in 1956, (sic) could that condition persist on indefinitely?

A It could.

Q Could that patient have periods of lucid intervals in which his mind seemed fairly clear?

A Yes, frequently he could seem almost normal.

Q Could he carry on normal activities, the activities of a normal person?

A Yes.

Q Now, Dr. Leland, I will ask you if you, in conjunction with myself, made any effort to secure the army or the Veterans Administration papers of this man?

A Yes, an effort has been made to locate the records.

Q Do you know whether we have been able to secure those records or not?

A We have not, I have not seen his records except the photostat here.

Q I believe you testified that you first came into this case just last Friday, is that correct?

A That is correct.

Q Does this give you a fair opportunity to thoroughly evaluate a patient of this sort?

A Yes, I believe so.

Q Now, Doctor, from your examination of this man, is he mentally well or ill?

A At the present time he is mentally ill.

Q And do you think that his condition will get any better or not?

A I don't know for sure. However, I expect that his condition will get worse instead of better.

Q Does that mean that he might eventually have to be committed?

SOL.-GEN.: I object to that, if the court please—

THE COURT: Let him state it without leading, if that's what you are objecting to.

SOL.-GEN.: I object further to the speculation about his future mental condition.

THE COURT: I think the doctor is qualified to go into that.

Q Will you answer the question?

A I feel that there is a likelihood that this defendant will continue to show mental symptoms which will get worse.

Q I will ask you, Doctor, if a person might know the difference between right and wrong and at the same time suffer a delusional insanity I believe the law calls it, as to one particular act or subject?

A Yes, that is possible.

Q Will you describe to the jury how that works?

A I can give you an example. For instance, a patient who has a religious fanaticism, who greets you on the street corner with the evils of murder, or who preaches right and wrong, under a delusion that someone was following him which would be false, an incorrect belief, he might turn around and shoot him. This would be an example of a person who knew technical right from wrong but who, because of his illness, might go against those beliefs temporarily.

Q Now, Doctor, I will ask you a hypothetical question. Suppose that a man's wife had gone away for some two or three months, and left him with a small baby which was ill, and he had heard during that time that she was running around or had been with other men, and if he were mentally ill, could that fact brood on his mind or dwell on his mind until he would become a victim of delusional insanity?

A Not unless he were mentally ill, and then he might be unpredictable. I could not predict whether this would become a delusion.

Q I say, it could happen?

A It could.

Q And he could then culminate that brooding and so forth by becoming unmanageable and doing harm to the person that he felt had wronged him, is that right?

A Yes."

The State's cross-examination of Dr. Leland proceeded in the following manner:

"Q Doctor in arriving at your conclusion about this defendant, Wilburn Jackson, you told Mr. Edwards I believe that it was necessary for you to obtain information and talk to other people, is that right?

A Yes.

Q It really was absolutely necessary, in analyzing the man, was it not?

A Yes, it was more than helpful.

Q You talked to William Baskin, did you not?

A Yes, that's the brother-in-law.

Q You also talked to Will Jackson, his father?

A Yes.

Q And you also talked to Sallie Kate Baskin, Wilburn's sister?

A Yes.

Q Now, did you go into detail with them about his past history, or ask them to tell you everything significant about his past conduct generally, all those three?

A Only to a limited extent, I probed only about his procedure in recent months prior to the alleged murder, and also general questions about what sort of mental condition he might have had.

Q In other words, you were only asking them about things which you felt would be helpful in determining his sanity at the time of the crime, and also his sanity at the present time?

A Yes, that's what I was looking for, and in a sense he volunteered what other things I got.

Q You didn't stop them from telling you, try to stop them from telling you anything that they wanted to about his past?

A That's true.

Q Now, I would like to ask you if a man who was having trouble with his wife or actually had information that his wife had been with some other man, or men, had actual information of that, that would not be a delusion, would it?

A No, that would be a fact, of course.

Q And if he was mad at her because of that, he would be mad at her because of something she had done, wouldn't he?

A Yes.

Q And he would not be mad at her because of something that he thought she had done, is that right?

A Yes.

Q So, if as the basis for killing her he used the fact that she had run around with a man, and that was a fact that he knew, he would not be killing her because of any delusion, would he?

A That's correct.

Q Now, an individual, speaking generally, a person who did not know right from wrong would not ordinarily try to conceal or hide a crime, would they?

A That's true.

Q They would not try to get away with it, hide the body, would they?

A That's true.

Q Now, it boils down to the present condition of this man, after studying him, I want to ask you simply this, you did reach the conclusion that he was able to stand trial, did you not?

A Yes, at this time I think he is able to stand trial.

Q Now, I will ask you this question. Based upon everything which you used in forming any opinion about Wilburn Jackson, any of the facts which his relatives gave you about his condition at the time of the killing, based on anything that he told you, did you form an opinion as to whether or not he knew right from wrong at the time of the killing?

A Yes.

Q And in your opinion did he know right from wrong at the time of the killing?

A Yes.

Q He did know right from wrong, is that your answer?

A Yes."

Defense counsel elicited the following responses from the witness on re-direct examination:

"Q Now, Doctor, if a man as I described before, his wife has been gone for some period of time against his will, left him with a small baby, he had heard that she was going around with other men, could he not brood over that, if he was mentally ill, and blow that thing up all out of proportion?

A Yes, that is quite true.

Q And commit a crime as a result, is that so?

A Yes.

Q I will ask you further, is it normal for a man, when he has committed a crime, even though he does bury the body, to bury it in a very shallow grave?

A First of all, it is not normal for a man to commit a crime, but as to your specific question I don't know whether the depth of the grave tells me anything about his mental condition.

Q I will ask you would it indicate a normal mind to take a bottle of Arrowick and sprinkle it over a grave to try to cover up the odor of the body?

A It would depend on whether the odor was a delusion or a fact.

Q. What do you mean by that answer?

A In other words, if there was an odor it would not be irrational. If there wasn't an odor, then of course it would be a delusion. I don't know which was the case.

Q I will ask you further is it rational or normal for a man, after he has buried the body, to take some person and show them where the body is buried and threaten them not to tell it, or threaten them if they do

tell it, would that be a normal reaction of a man to do that?

A I don't know, it would depend entirely on the relationship of the person to the other, I don't know."

The Solicitor-General again cross-examined Dr. Leland:

"Q In connection with that last question, tied in with the fact that a person knew right from wrong, if he tried to conceal the crime and conceal the body would that be consistent with his knowing right from wrong if he threatened anyone else that told about the crime?

A That would seem consistent with his knowledge of right and wrong."

Jackson's counsel, on re-direct examination, inquired into the defendant's ability to stand trial:

"Q You testified a while ago that you felt that the defendant was able to stand trial at this time. I will ask you in your opinion is he fully able to cooperate in his own defense?

A. No, he isn't, he is able to stand trial at this time, but he is still suffering from some mental illness. I feel this, I feel that he is able to understand the nature of the charges against him, and he is able to understand the proceedings that are going on at this time; however, he has shown to me repeatedly that he has some difficulty in relation to certain circumstances of the crime, in remembering minute details of the crime, in cooperating fully in the case, also some of the tests that I gave him show some evidence of mental retardation, his intelligence seems low. This of course is permanent, it will never change, and to that extent he is also unable to cooperate fully, he doesn't have full mental capacity at this time, but sufficient to stand trial.

Q Was he ever able to relate to you or did he ever relate to you the crime with which he is charged?

A No, only in response to detailed questions.

Q Did you ever get a thorough picture of the crime in talking to him?

A Absolutely not."

The examination of Dr. Leland concluded with the following questions from the prosecutor:

"Q You did say that he had a low I.Q., is that more or less the substance of what you said?

A Yes, I didn't actually say his I.Q., but generally yes.

Q Would the fact that he has been in jail for some time affect this finding and would it affect his mental condition leading up to this time?

A Confinement of any duration would not affect his intelligence at all, but it would affect his mental condition, his cooperativeness and so forth.

Q In your opinion has that affected his mental condition?

A To some extent, not just being in jail, but standing trial, knowing the trial was coming, all those factors had some influence on his mental condition.

Q In his reluctance to talk to you and in his accounts to you, is there a possibility that he is what we call malingering?

A Malingering or faking is a possibility here; however, malingering is usually of a higher intelligence than believe this man is, and usually has had some experience in mental illness previously. Most malingerers state their symptoms and over-do it. It is usually quite simple to detect.

Q You have not ruled out the possibility of malingering?

A Not completely, no.

Q Is there any question in your mind or did you receive any information that would put any real doubt in

your mind that he knew right from wrong at the time of the killing?

A    I have no evidence, hearsay or otherwise, that would make me believe that he was unable to distinguish right from wrong at the time. I believe he was in a lucid interval at that time."

Following the receipt of this testimony, the state trial judge did not, *sua sponte*, convene a separate proceeding designed to inquire into the competency of the defendant to stand trial. No request, not even a suggestion was made that such a proceeding was necessary or desirable. Almost twelve years later, the court below ruled in this proceeding that the trial judge's failure to order such a proceeding constituted a deprivation of Due Process of Law under the Fourteenth Amendment to the United States Constitution:

"In the instant case, the testimony of lay witnesses at the state trial indicated petitioner was not normal. The psychiatrist who examined petitioner testified in contradictory terms. However, the psychiatrist's testimony at the very least indicates petitioner was not able to recall some of the details surrounding the commission of the alleged crime. The argument of petitioner's defense attorney relating to the introduction into evidence of a letter from the United States Army suggested petitioner might have been suffering some disability. Clearly, under all of these circumstances, *Pate* requires that the state trial judge conduct a hearing on petitioner's competency to stand trial."

The lower court afforded the State an opportunity to establish that Jackson was competent to stand trial for murder on or about July 30, 1959. At the conclusion of additional hearings, during which Dr. Leland was called to testify for the State, the court below found that the State had failed to prove that Jackson was competent to stand trial in 1959. Consequently, the district court ordered Jackson delivered to the authorities of Haralson County, Georgia, to be retried within four months if found to be competent. It was directed that if found to be incompetent, Jackson should be retried when he regained sufficient competency to stand trial.

## II. *DISCUSSION*

The test for determining a criminal defendant's competency to stand trial was succinctly set forth in Dusky v. United States, 1960, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, reversing 271 F.2d 385, 8 Cir. 1959. Dusky was convicted of the unlawful transportation in interstate commerce of a girl who had been kidnapped. Title 18, U.S.C., Section 1201. The Court of Appeals affirmed. The Supreme Court granted certiorari and agreed with the Solicitor General's suggestion of error that the record insufficiently supported the trial judge's finding of the defendant's competency to stand trial. The Court directed the Court of Appeals to remand the case to the district court for a further competency hearing, continuing:

"We also agree with the suggestion of the Solicitor General that it is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" 362 U.S. at 402, 80 S.Ct. at 788, 4 L.Ed.2d at 825.

1966 brought the landmark decision of Pate v. Robinson, supra. In 1959 Robinson had been convicted in Illinois state courts of the murder of his common-law wife and had been sentenced to imprisonment for life. Throughout the state proceedings, Robinson's counsel insisted that his client's sanity was very much in issue. Evidence was introduced at trial bearing upon Robinson's long history of disturbed behavior, including his previous commitment to a mental institution and his service of four years in prison

for the killing of his eighteen month old son. In a subsequent federal habeas corpus proceeding, the district court denied relief, but the United States Court of Appeals for the Seventh Circuit reversed. United States ex rel. Robinson v. Pate, 345 F.2d 691 (1965). The Supreme Court granted certiorari and held: that Robinson had not waived his defense of incompetency to stand trial, that the evidence introduced at the state trial entitled him to a separate hearing on the competency issue, and that the state trial court's failure to make such an inquiry deprived Robinson of his constitutional right to a fair trial. The Court's language was:

"We believe that the evidence introduced on Robinson's behalf entitled him to a hearing on this issue. The court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial. . . . Illinois jealously guards this right. Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing pursuant to Ill. Rev.Stat., c. 38, § 104–2 (1963) . .." 383 U.S. at 385, 86 S.Ct. at 842, 15 L. Ed.2d at 822.

The Court declined to permit Illinois the opportunity to prove in a further proceeding that Robinson had been competent to stand trial in 1959:

"It has been pressed upon us that it would be sufficient for the state court to hold a limited hearing as to Robinson's mental competence at the time he was tried in 1959. If he were found competent, the judgment against him would stand. But we have previously emphasized the difficulty of retrospectively determining an accused's competence to stand trial. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). The jury would not be able to observe the subject of their inquiry, and expert witnesses would have to testify solely from information contained in the printed record. That Robinson's hearing would be held six years after the fact aggravates these difficulties. . . . " 383 U.S. at 387, 86 S.Ct. at 843, 15 L.Ed.2d at 823.

Illinois was given the option of retrying Robinson within a reasonable time or releasing him from custody. In the event of a retrial, Robinson would be entitled to raise the defense of incompetency to stand trial and to have a hearing on that issue should "a sufficient doubt" exist as to his present competence.

We had occasion, sitting en banc, to implement Pate v. Robinson in Lee v. State of Alabama, supra. Lee was arrested and charged with the murder of his father on July 6, 1942. On July 20, 1942, a sanity jury found him sane and he was indicted on October 20, 1942. The defendant was hospitalized in a mental institution from October 24, 1942, until August 3, 1943. On October 1, 1943, Lee pleaded not guilty by reason of insanity to the murder indictment. He was tried on October 27, 1943, found guilty, and sentenced to life imprisonment. His direct appeal from the judgment and sentence was unsuccessful. It did not raise the issue of competency to stand trial. After numerous unsuccessful habeas and coram nobis petitions and appeals raising the question of his competency to stand trial as well as other grounds, addressed to both the state and the federal courts, over a period of more than twenty years, Lee still persisted. The issue of his mental competency to stand trial was again presented to a panel of this Court by appeal from an adverse ruling of the district court in 1966. That panel affirmed, Lee v. State of Alabama, 5 Cir. 1966, 364 F.2d 945. Motion for rehearing was denied per curiam, Lee v. State of Alabama, 5 Cir. 1967, 373 F.2d 82, with Judge Thornberry dissenting by separate opinion, 373 F. 2d at page 84. The thrust of Judge Thornberry's dissent was that Pate v. Robinson, supra, had not been given its proper weight in the panel decision. Lee then sought rehearing en banc which was granted.

This Court en banc decided that Lee's constitutional rights had been violated by reason of the Alabama trial court's failure to hold a hearing at the time of trial, in addition to the hearing 15 months earlier, concerning Lee's competency to stand trial. We remanded with directions to the district court to afford Alabama an opportunity to demonstrate that there had been an actual determination of Lee's mental capacity at or about the time of trial and, in default of such a showing, to determine whether the district court could then conduct an adequate hearing on the question of Lee's competency. It was directed that if the district court found it could not adequately hold such a hearing, it should remand to the state court with directions to set aside the conviction and grant a new trial, which would include an adequate hearing on Lee's then mental capacity to stand trial. The following passage from our *Lee* opinion is worthy of note here:

"We, therefore, must now come to the second basis of the earlier denial of relief, that is the issue of whether the hearing authorized and held under Section 428, of Title 15, of the Alabama Code of 1940, fifteen months before Lee was actually put on trial for his life, at which the jury made a finding that Lee was 'sane', without more, sufficiently meets *the requirement that when a prisoner, either state or federal, seeking post-conviction relief, asserts, with substantial facts to back up his allegation, that at the time of the trial he was not mentally competent to stand trial, and that there was no resolution of that precise issue before he was tried, convicted and sentenced, the protection of the Fourteenth Amendment to the Constitution requires that such conviction and sentence be set aside unless upon adequate hearing it is shown that he was mentally competent to stand trial.*" (Emphasis supplied) 386 F.2d at 105.

Following our decision in *Lee*, supra, we have several times considered claims by state prisoners that their convictions had been obtained in violation of Pate v. Robinson. The essential nature of the issue presented has required us to decide each case on its own facts and circumstances. See, e. g., Tyler v. Beto, 5 Cir. 1968, 391 F.2d 993, cert. denied 1969, 393 U.S. 1030, 89 S.Ct. 642, 21 L.Ed.2d 574; Clark v. Beto, 5 Cir. 1969, 415 F.2d 71, and Carroll v. Beto, 5 Cir. 1970, 421 F.2d 1065. We undertake such an individualized analysis in the case now at bar.

As already noted, the state trial judge heard testimony from three witnesses bearing upon the mental condition of Wilburn Jackson. Mr. Baskin, Jackson's brother-in-law, related that Jackson was subject to fits of anger, particularly when confronted with disagreeable situations, but behaved normally between such episodes. Sheriff Allen, who obtained a confession from Jackson, told of Jackson's apparent sense of relief upon the discovery of his wife's body and the giving of the written inculpatory statement to the authorities. Despite Dr. Leland's trial testimony that Jackson was mentally ill, he stated at several points in his testimony that Jackson was competent to stand trial for the murder of his wife. According to Dr. Leland, the difficulties which Jackson was experiencing in communicating the detailed facts of his wife's murder were probably attributable to mental retardation, an irreversible condition.

In order to keep our inquiry in focus, we repeat that Jackson's counsel did not raise any question of competency to stand trial. Mental condition at the time of the offense was their sole concern. We are unwilling to hold under the facts as they came out in the 1959 trial for murder that the state trial judge violated Jackson's constitutional rights by failing to order, *sua sponte*, that a separate proceeding be initiated to inquire into the accused's competency to stand trial. The evidence presented to the state judge did not raise a *"bona fide* doubt" as to Jackson's competency to stand trial, as the concept of competency was articulated in *Dusky*, supra, and implemented in Pate v. Robinson, supra, and our en banc

decision in Lee v. State of Alabama, supra. The district court misunderstood and misapplied the controlling precedents in deciding to the contrary.

### III. CONCLUSION

Because we determine that the district court erred in ruling that the state judge who presided at Jackson's 1959 murder trial should have ordered, *sua sponte*, that a hearing be held concerning Jackson's competency to stand trial, we find it unnecessary to decide the further issue presented: whether the State of Georgia in this habeas corpus proceeding failed to establish that Jackson was competent to stand trial on or about July 30, 1959, the date of his murder trial. The judgment of the district court is reversed and the cause is remanded with directions to dismiss the petition for the writ of habeas corpus.

Reversed and remanded.