Jerome BOWDEN, Petitioner-Appellant,

v.

Robert FRANCIS, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellee.

No. 83–8426.

United States Court of Appeals, Eleventh Circuit.

May 14, 1984.

Rehearing and Rehearing En Banc Denied June 22, 1984.

742

Nelson Jarnagin, August Siemon, Atlanta, Ga., for petitioner-appellant.

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

---

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

Before TJOFLAT and FAY, Circuit Judges, and WISDOM *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Jerome Bowden, a Georgia death row inmate, appeals the district court's denial of his petition for habeas corpus relief. Bowden's principal constitutional claims concern his alleged mental incompetency and the failure of the trial court and his attorney to take appropriate steps to discover this fact. He contends that the trial court should have had him examined by a psychiatrist and determined his competency to stand trial before proceeding to trial and that his attorney should have introduced certain evidence regarding his mental state as a mitigating circumstance at the sentencing phase of his trial. Bowden's other claims concern the prosecutor's conduct during the trial. We do not find the constitutional error Bowden asserts. Accordingly, we affirm.

## I.

### A.

At 8:30 a.m. on October 11, 1976, Jerome Bowden, twenty-four, and James Lee Graves, sixteen, broke into the Columbus, Georgia home of Mrs. Kathryn Stryker, fifty-five. Mrs. Stryker, Graves' next door neighbor, lived with her paralyzed, bedridden, seventy-six-year-old mother, Mrs. Wessie Bell Jenkins. Bowden and Graves had been employed by Mrs. Stryker a week earlier, raking the fall leaves in her yard. It was then that they formulated a plan to burglarize her home. Bowden had twice previously been convicted of burglary.

Bowden and Graves entered the Stryker home armed with a pellet gun and disguised with wigs. When he discovered Mrs. Stryker, Bowden, using the pellet gun as a cudgel, attacked her. After bludgeoning her with sufficient force to crack open her skull,[1] he thrust a butcher knife into her chest up to the hilt.

1. The physician who performed the autopsy on Mrs. Stryker testified that the force used to strike the blows was extreme and more consistent with a plane crash or a car accident.

Bowden and Graves then ransacked the house and stole a television set, jewelry, and coins. When Bowden discovered Mrs. Jenkins in her bed, he beat her about the head. They then returned to Graves' house and disposed of the loot, joking about their successful adventure. They considered going to a shopping center to snatch purses, but decided against that course.

Three and one-half days later, prompted by the concerns of neighbors and friends, the police forced entry into the Stryker home. They discovered the dead body of Mrs. Stryker on the floor and the mortally wounded body of Mrs. Jenkins.[2] Following an investigation, Graves confessed to his participation in these crimes and implicated Bowden. Bowden learned that the police were looking for him and surrendered to an officer on October 15, 1976. On October 17, after having been repeatedly given his *Miranda* warnings, he confessed. Bowden and Graves were indicted by a Muscogee County, Georgia grand jury and charged with burglary, armed robbery, aggravated assault of Mrs. Jenkins, and the murder of Mrs. Stryker. The case was severed for trial; Bowden was tried first.

Prior to trial, Bowden's counsel filed a special plea of insanity and moved the Muscogee County Superior Court for the appointment of a psychiatrist to evaluate Bowden. He sought to have a psychiatrist render opinions on whether Bowden was competent to stand trial and whether he was insane at the time he committed the crimes. At an evidentiary hearing on his motion, counsel presented evidence that, he contended, suggested that Bowden was incompetent to stand trial. Bowden's sister and niece, with whom Bowden had lived for several months, testified to certain aspects of Bowden's behavior they considered bi-

zarre: he would sometimes sit on the bed and rock for hours at a time; on other occasions he would "cuss out" the children in the family. His sister also stated that Bowden's mother once attempted to have him examined by a psychiatrist, after Bowden had gotten into trouble with the law. Bowden's lead trial counsel testified that he had been having difficulty eliciting a coherent story from Bowden concerning his activities on the day of the crime; counsel admitted, however, that Bowden had been cooperating with him in all other respects in his preparation of the case for trial. The court denied the motion for a psychiatric evaluation, and counsel withdrew Bowden's special plea of insanity.

Bowden went to trial on December 7, 1976. On December 9, at the conclusion of the guilt phase of the trial, the jury found Bowden guilty as charged. The sentencing phase of the trial followed for the purpose of determining whether Bowden should receive the death penalty for the murder of Mrs. Stryker. The jury found that the murder had been committed under aggravating circumstances and recommended that Bowden be sentenced to death.[3] The court, being bound under Georgia law to follow the jury's recommendation, sentenced Bowden accordingly.

## B.

On direct appeal, the Georgia Supreme Court affirmed Bowden's convictions and his death sentence. *Bowden v. State*, 239 Ga. 821, 238 S.E.2d 905 (1977), *cert. denied*, 435 U.S. 937, 98 S.Ct. 1513, 55 L.Ed.2d 533 (1978). Bowden then petitioned the Superior Court of Butts County, Georgia for a writ of habeas corpus. The court, following an evidentiary hearing, denied Bowden's petition on January 10, 1979. The Supreme Court of Georgia affirmed. *Bow-*

---

**2.** Mrs. Jenkins died several weeks later, after Bowden and Graves were indicted for the murder of Mrs. Stryker and the other crimes indicated in the text *infra*.

**3.** To recommend that a defendant be sentenced to death for murder, Georgia law, in force when the offenses in this case were committed, required that the jury find that the murder was

committed under one or more aggravating circumstances. Ga.Code Ann. § 27–2534.1 (1978). In this case, Bowden was charged with having murdered Mrs. Stryker while he was engaged in the commission of another capital felony, i.e., armed robbery, and while he was engaged in the commission of burglary. *Id.* at (b)(2).

*den v. Zant,* 244 Ga. 260, 260 S.E.2d 465 (1979), *cert. denied,* 444 U.S. 1103, 100 S.Ct. 1068, 62 L.Ed.2d 788, *reh'g denied,* 445 U.S. 973, 100 S.Ct. 1671, 64 L.Ed.2d 252 (1980). On August 13, 1980, Bowden again petitioned the Superior Court of Butts County for a writ of habeas corpus. The court considered the petition successive and summarily rejected it on September 4, 1980. The Supreme Court of Georgia denied Bowden's application for a certificate of probable cause to appeal this disposition. Bowden then turned to the Superior Court of Muscogee County for relief, filing an extraordinary motion for a new trial on the basis of "newly discovered evidence." The motion was heard by a different judge than the one who had tried Bowden's case (since the latter had retired) and was denied. That court then scheduled Bowden's execution for September 3, 1982, but stayed it pending Bowden's appeal of the court's order denying his motion for a new trial. The Supreme Court of Georgia affirmed that order on October 27, 1982, *Bowden v. State,* 250 Ga. 185, 296 S.E.2d 576 (1982), and a new execution date, December 16, 1982, was set.

On December 10, 1982, Bowden petitioned the district court for a writ of habeas corpus and moved for a stay of his execution, which was granted. On May 6, 1983, the district court denied Bowden's petition without an evidentiary hearing. On June 10, it granted Bowden's application for a certificate of probable cause to appeal, and this appeal followed.

### C.

In this appeal, Bowden presents six federal constitutional claims.[4] Each claim is exhausted, having been presented to the Georgia courts and disposed of on the merits. First, Bowden claims that the state trial court failed to order a psychiatric examination for the purpose of determining Bowden's competence to stand trial, in violation of the due process clause of the fourteenth amendment. Second, Bowden claims that the trial court's refusal to appoint a psychiatrist to examine him precluded him from presenting evidence of his mental illness in mitigation of sentence at the sentencing phase of his trial, in violation of the due process clause of the fourteenth amendment. Third, Bowden claims that the trial court prevented his attorney from arguing Bowden's mental condition to the jury as a mitigating circumstance during the sentencing phase of the trial, in violation of the eighth and fourteenth amendments. Fourth, Bowden claims that the prosecutor denied him due process of law, in violation of the fourteenth amend-

---

**4.** Bowden presented sixteen federal constitutional claims in his habeas petition to the district court. The ten claims which he does not press on appeal were as follows: (1) that the refusal of the state habeas court to provide petitioner with sufficient funds to present necessary evidence in his habeas appeal violated his rights under the fifth, sixth, eighth, and fourteenth amendments; (2) that his signed confession to the police (i.e., his second confession, *see infra* part II.E.) was involuntary in violation of his rights under the fifth, sixth, and fourteenth amendments; (3) that his jury failed the *Witherspoon* test in violation of his rights under the sixth and fourteenth amendments; (4) that the trial court's instruction to the jury that they could believe petitioner's confession in whole or in part violated his rights under the fourteenth amendment; (5) that the trial court's jury charge in the penalty phase of petitioner's trial failed adequately to define the relevant statutory aggravating circumstances, violating his rights under the eighth and fourteenth amendments; (6), (7), (8), (9), and (10) that the death

penalty as administered in Georgia is arbitrary, discriminatory, lacks theoretical justification, does not provide for adequate appellate review, and involves a means of execution which is equivalent to torture in violation of his rights under the eighth and fourteenth amendments.

Claims (1), (3), (4), and (5) were litigated on the merits in petitioner's state habeas proceedings. Claims (6) through (10) were raised and disposed of on the merits both in petitioner's direct appeal from his convictions and death sentence and in his state habeas proceedings. All of these claims were rejected by the district court on the merits.

Claim (2) has not been presented to any state court. The district court noting this fact refused to give this claim any consideration. At oral argument before this court counsel for Bowden stated that the insertion of this claim in Bowden's federal habeas petition was a clerical error. He further stated that he would accept it as having been decided adversely to his client on the merits by the district court and abandoned on appeal.

ment, by failing to give him clear notice of the prior convictions the state planned to use against him as an aggravating circumstance at the sentencing phase of his trial. Fifth, Bowden claims that the trial court denied him his sixth and fourteenth amendments right of confrontation by allowing the prosecutor to introduce James Graves' confession into evidence without calling Graves to the witness stand to testify.[5] Sixth, Bowden claims that his lead trial counsel rendered ineffective assistance, in violation of the sixth and fourteenth amendments, in failing to interview prosecution witnesses prior to trial and in failing to unearth readily available evidence of Bowden's low intelligence for use in mitigation during the sentencing phase of Bowden's trial.

Bowden contends that the record establishes each of these claims as a matter of law and that he is entitled to the issuance of the writ. If the record does not establish these claims as a matter of law, Bowden contends that he is entitled to an evidentiary hearing in the district court to prove them. We conclude that an evidentiary hearing in the district court is not necessary. Bowden's first five claims must be determined on the basis of the record of the criminal proceedings, both pretrial and trial, against Bowden in the Superior Court of Muscogee County. That record demonstrates that Bowden is not entitled to relief on any of these claims. Bowden's sixth claim was fully and fairly litigated in the first habeas corpus proceeding that Bowden brought in the Superior Court of Butts County. That court's findings of fact on this claim, which we presume to be correct,[6] demonstrate that Bowden's sixth claim must also be denied.

## II.

### A.

▮ Bowden claims that the trial judge committed constitutional error by refusing to have him examined by a psychiatrist prior to trial for the purpose of determining whether he was competent to stand trial. It is of course a violation of due process to try a criminal defendant while he is mentally incompetent, incapable of understanding the nature of the proceedings pending against him and assisting his lawyer in the conduct of his defense. *Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983).

> When a court has a 'bona fide doubt' as to the defendant's competence [to stand trial], it must *sua sponte* conduct a hearing on his competence to stand trial. *Pate v. Robinson*, 383 U.S. 375, 385, 387, 86 S.Ct. 836, 842, 843, 15 L.Ed.2d 815 (1966); *Scarborough v. United States*, 683 F.2d 1323, 1324 (11th Cir.1982); *Zapata v. Estelle*, 588 F.2d 1017, 1020 (5th Cir.1979). This procedural guarantee, known as a *"Pate* hearing," protects the defendant's substantive constitutional right to a fair trial.

*Hance v. Zant*, 696 F.2d at 948.

Bowden claims that prior to trial he raised a bona fide doubt as to his compe-

---

**5.** An argument could be made that this claim has not been exhausted. The argument would be (1) that Bowden failed to object at trial to the introduction of Graves' confession into evidence on sixth and fourteenth amendment confrontation grounds, (2) that Bowden failed to present such an objection to the Supreme Court of Georgia on direct appeal, and (3) that Bowden could still obtain an adjudication of his claim on the merits in the Georgia courts. *See infra* part II.E. Bowden did not pursue the first step. We cannot determine with certainty whether Bowden pursued the second step; the supreme court's dispositive opinion does not indicate whether Bowden presented a confrontation clause claim for review, and we have not been provided a copy of Bowden's brief to the su-

preme court so to enable us to ascertain precisely what claim Bowden may have raised. *See infra* note 8. Because the supreme court did consider Bowden's objection to the introduction into evidence of Graves' confession, albeit under Ga.Code Ann. § 38–414 (1978) rather than thé confrontation clause, and would probably decline to review that objection again, we treat this claim as exhausted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570 n. 28, 71 L.Ed.2d 783 (1982); *Darden v. Wainwright*, 725 F.2d 1526 at 1533 (11th Cir.1984) (en banc) (Tjoflat, J., dissenting).

**6.** 28 U.S.C. § 2254(d) (1982).

tence to stand trial and that the trial court was accordingly obligated to conduct a *Pate* hearing. The court failed to do so. Consequently, Bowden contends, the district court, as instructed by *Pate*, should have held "a *nunc pro tunc* competency hearing [if] a meaningful inquiry into [his] competency [at the time of his trial] could still be made." *Id.* Bowden asserts that such a meaningful inquiry is no longer possible. Therefore, he must be retried, assuming he is now competent; if he is not, he must be released. *Id.* We disagree.

Our examination of the record of the proceedings in the state trial court, especially those which dealt with Bowden's suggestion that he was incompetent to stand trial, convinces us that a bona fide doubt as to Bowden's competence was not presented. Accordingly, the trial judge was not obligated to have Bowden examined by a psychiatrist to determine his competence and, after receiving the psychiatrist's report, to hold a hearing to adjudicate his competence to stand trial.

The only evidence Bowden presented to raise a bona fide doubt as to his competence was, as we have indicated *supra*, the testimony of his lead trial lawyer, his sister and his niece. The lawyer, Samuel Oates, testified that Bowden had been unable to give him a clear sequence of his activities on the day the crimes at the Stryker residence were committed. Oates added, however, that Bowden was concerned about his case and was attempting to assist him in the preparation of his defense. For example, Bowden said that he had an alibi, he was with a friend watching television when the crimes were taking place, and that the confessions he had given the police had been coerced. Bowden's sister and niece testified that Bowden had lived with them (and the sister's husband and family) for several months following his release from prison in August 1975. During that time, his niece observed Bowden sit on the bed and rock, often for several hours; he did this on days when he was not working. His sister said that the children sometimes complained that Bowden would "cuss" at

them. She also testified that, years earlier, after Bowden had had several scrapes with the law, his mother thought he needed psychiatric help. The trial judge concluded that the evidence suggesting Bowden's incompetency was, taken as a whole, insufficient to "warrant the expense of a psychiatric evaluation," and he denied Bowden's motion for the appointment of a psychiatrist. The court advised Bowden's counsel that it would proceed to summon a jury to try Bowden on the issue of competence to stand trial if Bowden wished to litigate his special plea of insanity. Counsel rejected the offer and withdrew the special plea.

*Hance v. Zant* instructs that, in determining whether a trial court has denied a defendant due process by refusing to obtain a psychiatric evaluation, we must "focus on what the trial court did in light of what it then knew," *id.*, at 948, concerning, for example, the defendant's behavior, his demeanor at trial, and any prior medical opinion touching on his competence to stand trial. In this case, the evidence of Bowden's past behavior and his behavior and demeanor before the trial judge plainly failed to create a bona fide doubt as to his competency to stand trial. Nor was there any evidence of a prior medical opinion that might have raised such a doubt. The trial judge therefore committed no pretrial error in denying Bowden's motion for a psychiatric evaluation.

*Pate* and its progeny hold or at least strongly intimate, however, that a trial court's proper pretrial disposition of a motion for a psychiatric examination may not end the matter. If subsequently during the trial proceedings a bona fide doubt should arise concerning the defendant's competency, the court would be obliged to resolve the issue and, to aid it in doing so, may be required to obtain an expert psychiatric opinion.

In this case, though, nothing that transpired after the denial of Bowden's motion for an examination raised such a doubt. On the contrary, any lingering uncertainty that may have existed concerning

the defendant's competence disappeared. First, Bowden's counsel withdrew his special plea of insanity, a tacit admission that without expert psychiatric testimony he could not satisfy a jury, in a trial on the special plea, that his client was incompetent; that is, his lay testimony, which the judge had already considered and rejected, could not carry the day. Second, the events that transpired throughout the remainder of the trial suggested that Bowden was indeed competent. He took the stand in his own defense and testified coherently, responding to the questions put to him on both direct and cross-examination. He told about surrendering to the police after learning that the police had been looking for him and about confessing to the crimes. He said that the police coerced his confession, forcing him to adopt Graves' earlier confession, and he insisted that he was innocent.

A reading of Bowden's testimony indicates that Bowden was not very intelligent. It also indicates that he had consulted and cooperated fully with his attorney in the preparation of his defense and was well aware of the nature and consequences of the proceedings taking place. It is significant to note that Bowden was able to withstand the prosecutor's vigorous and lengthy cross-examination practically to the end, steadfastly professing his innocence and repudiating his confessions as coerced. He did not waiver until the prosecutor's final thrust; when asked if he had smoked marijuana after he and Graves had committed the crimes in question, he replied that he had, that it had been his idea to "get high" that morning. Even then, he attempted to rehabilitate himself; on redirect examination he said he had misunderstood the question.

■ Each *Pate* claim—that the lack of a psychiatric evaluation and subsequent competency determination denied the defendant due process—must of course be decided on its own facts. No two cases are alike.

When we do compare this case with the others in the *Pate* jurisprudence, however, we are well satisfied that Bowden "has failed to meet his habeas burden of producing facts that positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to his actual competency during trial." *Reese v. Wainwright*, 600 F.2d 1085, 1091 (5th Cir.), *cert. denied*, 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979).[7] *See, e.g., Hance v. Zant*, 696 F.2d at 948–49 (no *Pate* violation though Hance had written letters from the "forces of evil" replete with seemingly lunatic ravings); *Jackson v. Caldwell*, 461 F.2d 682 (5th Cir.), *cert. denied, sub nom. Jackson v. Georgia*, 409 U.S. 991, 93 S.Ct. 334, 34 L.Ed.2d 257 (1972) (no *Pate* violation though defendant was mentally retarded, had been discharged from Army for mental illness, was subject to schizophrenic fits of anger and paranoia and had murdered his wife, burying her in a field and planting peas over her corpse). *See also Williams v. Bordenkircher*, 696 F.2d 464, 465–67 (6th Cir.), *cert. denied*, — U.S. —, 103 S.Ct. 1898, 77 L.Ed.2d 287 (1983); *see also, United States v. Oliver*, 626 F.2d 254, 258–59 (2d Cir.1980) (finding of competence upheld because judge had substantial opportunity to observe and question defendant).

### B.

Bowden claims that the trial judge refused to appoint a psychiatrist to examine him for the purpose of presenting evidence of his mental illness to the jury at the sentencing phase of the trial and thereby denied Bowden due process of law. Bowden cites *Westbrook v. Zant*, 704 F.2d 1487 (11th Cir.1983), as authority for his position. We conclude that *Westbrook* is inapposite.

*Westbrook* was a habeas corpus proceeding; the petitioner, Westbrook, like Bowden, was a Georgia inmate attacking both his multiple convictions and his death sentence. Prior to trial, he moved the court

---

7. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

for state funds so that he could employ a psychologist or psychiatrist to assist him in presenting mitigating evidence to the jury in the sentencing phase of his trial. The court denied his motion. On habeas review, we said that *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), placed "an *affirmative duty* on the state to provide the funds necessary for [a defendant's] production" of evidence in mitigation, that "[p]ermitting an indigent capital defendant to introduce mitigating evidence has little meaning if the funds necessary for compiling the evidence is unavailable." 704 F.2d at 1496 (emphasis in original). We concluded that the state must "furnish the services of a psychologist or psychiatrist in those capital cases deemed appropriate by the state trial court." *Id.*

Arguably, the foregoing statements are dicta because the *Westbrook* court, after observing that the mitigating evidence Westbrook sought to produce through the testimony of a psychological expert was available from Westbrook's "friends, relatives or neighbors," concluded that "the circumstances of this case provided an inappropriate setting for the appointment of psychological assistance," *id.,* and that the state trial court had not abused its discretion in denying Westbrook's request for such assistance.

■ In this case, the defendant made no such request of the trial judge; Bowden's motion for the appointment of a psychiatrist was limited to the issues of his compe-

tence to stand trial and his sanity at the time of the offense. It said nothing about the appointment of a psychiatrist to testify in mitigation during the sentencing phase of the trial. In fact, the claim Bowden now presents was not submitted to the Georgia courts until his appeal to the Georgia Supreme Court from the Butts County Superior Court's denial of his first petition for a writ of habeas corpus.[8] The Supreme Court rejected his claim out of hand, concluding that it was "without legal basis." *Bowden v. Zant,* 260 S.E.2d at 468.

To hold that the state trial judge denied Bowden due process of law by not providing him with a psychiatrist to testify in mitigation, when Bowden made no request therefore, would require us to find that a trial judge has a duty under the Constitution to make such provision *sua sponte.* This we refuse to do. Accordingly, we reject Bowden's second claim.

### C.

■ Bowden argues that the trial judge violated his rights under the eighth and fourteenth amendments by preventing his lawyer from arguing Bowden's mental condition as a mitigating circumstance in his summation to the jury at the close of the sentencing phase of his trial. Bowden did not assign this claim as error in his direct appeal to the Supreme Court of Georgia following his conviction and sentence.[9] This procedural default was cured, however, when that court disposed of Bowden's claim on the merits in considering his ap-

8. We draw this conclusion because Bowden did not present this claim in his habeas petition to the Butts County Superior Court, and the claim was not mentioned in that court's order disposing of his petition. *Bowden v. Zant,* 260 S.E.2d at 470–74 (appendix to the Georgia Supreme Court opinion). The record before us does not contain the brief Bowden filed with the Georgia Supreme Court in his appeal from that order; thus we have no definitive means of determining precisely how the claim arose. We could make this determination if the Georgia Attorney General had complied with his duty under the federal habeas corpus rules to attach to his answer to Bowden's petition copies of Bowden's brief. *See* rule 5, Rules Governing § 2254 cases, 28 U.S.C. foll. § 2254 (1976): "If the petitioner

appealed from the judgment of conviction or from an adverse judgment or order in a postconviction proceeding, a copy of the petitioner's brief on appeal and of the opinion of the appellate court, if any, shall also be filed by the respondent with the answer."

9. We so conclude, even though the record, here, does not include the brief Bowden presented to the Georgia Supreme Court on direct appeal, *see supra* note 8, because that court did not mention this claim in its disposition of that appeal. We thus presume that Bowden first raised this claim in his initial habeas petition to the Butts County Superior Court.

peal from the Butts County Superior Court's denial of his first petition for a writ of habeas corpus. *Bowden v. Zant*, 260 S.E.2d at 467. Consequently, we address Bowden's claim without requiring him to satisfy the threshold "cause and prejudice" test of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■ In addressing, and disposing of, this claim, the Georgia Supreme Court stated that

> Bowden erroneously asserts that the defense attorney was denied a full argument on the subject of mitigation. He was attempting to argue that Bowden was insane and that the state had denied him the right to prove it. That was untrue, and the trial court committed no error in sustaining an objection to that line of argument.

260 S.E.2d at 467. We draw the same conclusion from the transcript of Bowden's trial. The trial judge's curtailment of counsel's argument, which amounted to nothing more than a criticism of the court's ruling on Bowden's pretrial motion for the appointment of a psychiatrist,[10] was entirely proper. Bowden's motion and the ruling thereon could not have constituted a relevant sentencing consideration. The court did permit counsel wide latitude, however, to argue that the jury should consider Bowden's mental state as a mitigating circumstance sufficient to spare him the death penalty. Bowden points to nothing in the trial judge's supervision of the final summations in the sentencing phase of the trial that prevented his lawyer from commenting on "any aspect of [Bowden's] proffer[ed] evidence as a basis for a sentence less than death." *Lockett v. Ohio*, 458 U.S. 526, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

#### D.

■ Bowden claims that the prosecutor denied him due process of law by failing to give him clear notice of the prior convictions the state planned to use against him as an aggravating circumstance in the sentencing phase of the trial. Georgia law provides "that only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible." Ga.Code Ann. § 27–2503(a) (1978). Bowden contends that due process requires this notice to be written and formal.

■ We agree with the Georgia Supreme Court, and the district court below, that there is no authority for this proposition. Before the trial proceedings began, the prosecutor gave Bowden's counsel actual and clear oral notice of the record of Bowden's prior convictions that he would seek to introduce into evidence at trial. There was no legislative or judicial requirement that the notice be written; all that was required was that the defendant have adequate, and timely, notice. As the High Court has observed, using the words of the Georgia Supreme Court:

> "The purpose of Code Ann. § 27–2503(a) is to allow a defendant to examine his record to determine if the convictions are in fact his, if he was represented by counsel, and any other defect which would render such documents inadmissible during the pre-sentencing phase of the trial." *Herring v. State*, 238 Ga. 288, 290, 232 S.E.2d 826 (1977).

*Zant v. Stephens*, ―― U.S. ――, ―― n. 23, 103 S.Ct. 2733, 2748 n. 23, 77 L.Ed.2d 235 (1983). We therefore find no merit Bowden's due process claim of insufficient notice concerning his prior convictions.

#### E.

Bowden claims that the trial judge denied him his sixth and fourteenth amend-

---

**10.** The court's interference with Bowden's closing argument occurred on two occasions, both after the prosecutor objected. The first occurred after counsel told the jury that "[t]his Court denied this man an opportunity of being examined to determine his intelligence or his sanity." The second occurred following a simi-

lar comment: "[t]he Court denied him an opportunity for being examined by a psychiatrist.... They would rather not know whether he is sane or insane or how smart he is." The trial court was correct in sustaining the prosecutor's objection to this line of argument.

ments right of confrontation by allowing the prosecutor to introduce James Graves' confession in evidence without calling Graves to the witness stand to testify. To place this claim in proper context, it is necessary to review the events that led to the prosecutor's use of Graves' confession.

Prior to trial, Bowden's counsel knew that the state's case against Bowden was strong. Bowden had twice confessed[11] to the police, and the police had uncovered some jewelry and a television set that Bowden and Graves had taken from the Stryker residence. The police had also found the pellet gun Bowden had used to bludgeon Mrs. Stryker.

Bowden's first confession took place spontaneously, shortly after Bowden had surrendered to the police, as he and Detective Warren Myles sat in a police car in front of Bessie McCrory's house.[12] McCrory was Graves' girlfriend. The police believed that she could implicate Bowden and Graves in the Stryker murder, and they had gone to her house to question her. They had Bowden in their custody at the time. When they arrived at McCrory's house, Detectives C.E. Hillhouse and Arthur Hardaway went inside; Detective Myles remained in the police car with Bowden. Bowden knew that Graves had already given the detectives a complete written statement about the Stryker murder and the roles he and Bowden had played in the crimes at her residence. Bowden decided to clear his conscience; he told Myles that he had killed Mrs. Stryker and that he "couldn't lie about it."

After Detectives Hillhouse and Hardaway finished questioning McCrory they returned to the car and took Bowden to the police headquarters. There, Bowden saw some of Mrs. Stryker's jewelry the police had found in a stove on the back porch of Graves' house, and he volunteered that he had hidden the jewelry in the stove. Bowden then proceeded to give the police a detailed, signed statement of the crimes, the essence of which we have related in part I.A. *supra.*

Faced with this highly incriminating evidence, Bowden adopted the following trial strategy: he would deny that he had committed the crimes in question and he would explain away his signed confession by claiming that the police, using Graves' signed statement as a tool, had coerced it. The details of the crimes that he had provided the police, he would contend, actually came from Graves' statement, not originally from him.

This strategy first came into play during the State's case, in Bowden's cross-examination of Detective Hillhouse. Hillhouse, on direct examination, had introduced the detailed signed confession Bowden had given at the police headquarters, following the trip from McCrory's house. Hillhouse, in the presence of Detectives Myles and Hardaway, had typed Bowden's statement as Bowden gave it; then, after reading the statement, Bowden had signed it. His lawyer, on cross-examination, attempted to get Hillhouse to say that he had wrung the confession from Bowden by putting words in his mouth—Graves' words. Hillhouse admitted that he knew Graves had given a full, signed confession but insisted that Bowden's statement came from Bowden alone. Nonetheless, by the time Hillhouse left the stand the question had been firmly planted in the jurors' minds whether Bowden's statement was actually his, or Graves'. To answer the question a close comparison of those statements might well be necessary. Bowden repeated this trial strategy in cross-examining Detective

---

**11.** The record on appeal indicates that Bowden actually confessed three times, on the two occasions we recite in the text that follows and on a third occasion on which the record is not informative. The third confession was suppressed, on Bowden's motion, and its validity is not an issue in this appeal. This confession, and Bowden's lawyer's treatment of it, is, however, relevant to Bowden's ineffective assistance of counsel claim discussed in part II.F. *infra.*

**12.** The State introduced this confession into evidence without objection. Detective Myles, who introduced it, testified that Bowden gave it after being advised of his *Miranda* rights. The admissibility of this confession has not been questioned in the instant habeas proceedings.

Myles. Myles, however, also maintained that the words in Bowden's statement originated with Bowden, not Graves'.

Detective Hardaway was the final police officer called to establish Bowden's signed confession. Hardaway was the officer in charge of the investigation. He was the one who took Graves' statement, and he was present with Hillhouse and Myles when Bowden gave the statement Hillhouse typed. On cross-examination, Bowden's lawyer again raised the question of whether Bowden had really confessed or merely succumbed to the pressure of the interrogation and adopted Graves' statement. Hardaway refused to budge, however, insisting that the words in Bowden's statement came only from Bowden.

Bowden made the detectives' credibility the central focus of the guilt phase of the trial when he took the stand in his own defense. He immediately undertook to explain away his signed statement, and the brief confession he had made earlier to Detective Myles. He said that he had surrendered to the police simply because he had heard that the police were looking for him. He testified that when they initially told him about Mrs. Stryker's murder he denied any involvement in it. He admitted that he subsequently told Detective Myles that he had killed Mrs. Stryker; he confessed, he said, because Myles promised him that if he did Myles would "keep [him] from going to the electric chair." He thereafter signed a formal statement at the police headquarters because he was afraid. He said the words in that statement came from Graves' statement; they had been read to him by Detective Hardaway.[13]

13. The direct examination of Jerome Bowden contained the following colloquy.

Q Tell us how the interrogation was conducted?
A Sir?
Q Did he ask you oral questions? Would he read from James Graves' statement?
A Yes, he would. He would read a paragraph from Graves' statement.
Q Which detective did this?
A Detective Hardaway.
Q Detective Hardaway? And you said Detective Hillhouse and Detective Myles were present?
A Right.
Q In the office at this time?
A Right.
Q And James Graves' written statement was there?
A Yes, it was.
Q And Sergeant Hardaway was reading from the James Graves' statement?
A Yes, sir.
Q As he took your statement?
A Yes. Detective Hillhouse was the one sitting behind the desk and Sergeant Hardaway was—
Q Who was typing?
A Detective Hillhouse was the one doing the typing.
Q Who was the one with the statement?
A Detective—Sergeant Hardaway had picked the statement up off the desk and began to—
Q You heard Detective Hillhouse testify that he had never seen James Graves' written statement, didn't you?
A Yes.

Q Your testimony is that written statement was in this office while your interrogation was being conducted?
A Yes.
Q While you were giving your statement?
A Yes, sir, it was.
Q Okay. Go on, tell us what you told the detectives, now.
A Then I told the detectives that I had once again killed Mrs. Stryker and took—
Q Jerome, that statement that Detective Hillhouse read into Court was somewhat detailed. Where did you get all these details? How did you know everything happened?
A The only way that I knew what had happened is from them reading the statement to me because before they read the statement to me I didn't know anything about any kind of statement. The only way I knew it was a statement that—
Q You are telling us that you confessed to that crime and inserted the contents of James Graves' statement?
A What was that?
Q I am sorry. In other words, you are telling us that you confessed to that crime again in that office and the details of that crime that you told them of your statement came from James Graves' statement?
A Yes, sir.
Q But you have not—you had not been allowed to read James Graves' statement at that time?
A No. It was always kept away from me where I couldn't reach it, where I—
Q Do you have any idea how much of James Graves' statement had been read to you?
A No, I don't.

On cross-examination, Bowden stood firm. He continued to profess his innocence and to claim that his signed confession was false, that it had been lifted from Graves' statement. It was in an effort to impeach this testimony, and, at the same time, to buttress the testimony of Detective Myles, Hillhouse and Hardaway, that the prosecutor engaged in the conduct Bowden now claims violated the confrontation clause. The prosecutor asked Bowden a series of questions which contained information that appeared in Graves' signed statement but not in Bowden's. What the prosecutor was after, obviously, was Bowden's admission that his statement contained information that Graves had not given the police, that is, information that could only have come from him, from his independent recollection of what had taken place at the Stryker residence on the morning of October 11, 1976. The prosecutor's questions and Bowden's answers appear in the margin; [14] we quote in the text the

14. The colloquy between the prosecutor and Bowden, the defense objections thereto, and the court's rulings thereon were as follows:

[PROSECUTOR]: You have testified that the details given you in this statement were provided from the statement of James Lee Graves, is that correct?

A That is correct.

Q All right. Now, if there are details in your statement that are not contained in the statement of Graves, where did they come from?

A It wasn't no under—only detail I know of that came from Graves' statement—

Q Did you make up anything just to tell them?

A No, I didn't.

Q Didn't just make up anything? Mr. Cain [one of Bowden's trial attorneys], I believe you have his original statement. May I have it, please? I will use a copy, that is all right. Mr. Cain has indicated that the original is at his home. I have a photographic copy that I would like to proceed from.

MR. OATES: We have no objection to that.

THE COURT: All right.

[PROSECUTOR]: Let me ask you this: Where did the way of entry—according to the way your statement reads, the two of you entered that house after Graves popped the front lock with a screwdriver, is that correct?

A Yes, it is.

Q Did you provide that information or did it come from the statement of Graves?

A Came from the statement of Graves.

Q *Then if the statement of Graves does not say how that house was entered, somebody is not telling the truth, is that correct?*

A That is true.

Q And if the statement of Graves should say—

MR. OATES: Your Honor, before he goes into this, now, am I to understand you are reading from the statement of Graves?

[PROSECUTOR]: I am not reading anything. I am asking him a hypothetical question, if it should say. He is on cross-examination, Your Honor.

THE COURT: All right. I will allow you to proceed.

MR. OATES: We will object to any reading of any statement.

[PROSECUTOR]: I am not reading the statement.

THE COURT: Yes, sir. I sustain the objection with respect to any reading of the statement.

[PROSECUTOR]: I don't intend to, Your Honor. *If the statement of Graves should state that you snuck in and hit Mrs. Stryker on the back of the head while she was looking the other way, where did this part about her coming out and looking up and saying, "Oh my God, Jamie," where did that come from?*

A That, I don't know, because that could have been in Graves' statement.

Q But if it is not, where did it come from?

A That, I can't verify.

Q *And if the statement of Graves is silent about the beating of Mrs. Jenkins in the bed, where did that come from?*

A That came from one of the detectives because the only way that I knew that there was a beating, that Detective Hillhouse mentioned it.

MR. CAIN: I would like to interpose an objection. There being numerous hypothetical questions asked by the [Prosecutor] regarding the statement of Graves, with him sitting there with printed material sitting on his desk, with many questions being asked, hypothetical about what if the statement of Graves did say, the only conclusion this jury could reasonably reach is that in fact he is raising these hypothetical questions from the statement of Graves, that he does have. I think the effect of him so doing is exactly the same effect as if the statement of Graves was being introduced, and for that reason we object.

[PROSECUTOR]: Your Honor, this witness brought up in his evidence that the only details that he was able to give for the—on the commission of this crime came from a statement of a co-defendant. We did not bring that up. We do not intend to read the statement but I think that we should be able to ask questions concerning what may or may not be in that, and to subsequently not read the statement, but to make proof or whether or not

questions Bowden has selected, and cited in his brief, as the most egregious. The prosecutor asked Bowden:

If the statement of Graves should state that you snuck in and hit Mrs. Stryker on the back of the head while she was looking the other way, where did this part [in your signed statement] about her coming

out and looking up and saying, "Oh my God, Jamie," where did that come from?

\* \* \* \* \* \*

And if Jamie Lee Graves, in his statement, never mentioned anything about going in the house 8:00 or 8:30 in the morning, where did that [detail in your signed statement] come from?

\* \* \* \* \* \*

that statement covers simply certain areas and to do otherwise would give him a carte blanc to get up here, say whatever he wants to completely free from my cross-examination.

THE COURT: Yes, sir, I will overrule the objection and allow to continue.

[PROSECUTOR]: Let me ask you this: There are certain parts of your statement, for example, after you and Jamie Graves raked the yard, that you went to the Krystal. Did James Graves go to the Krystal with you?

A No, he didn't.

Q Did you tell him you went to the Krystal?

A Yes, I did.

Q All right, sir. You said in your statement that you stayed with Jamie every night from Thursday when you raked the yard until you went into the house, is that correct, in your statement.

A No, it is not correct.

Q But you told the detectives that?

A Yes, I did.

Q *And if that should not be covered in Graves' statement, where did it come from?*

A Probably came from one of the detectives, because they was asking me where was I staying, you know.

Q *And if James Lee Graves, in his statement, never mentioned anything about going in the house about 8:00 or 8:30 in the morning, where did that come from?*

A That, I don't know, because it was read from James Graves' statement by one of the detectives that he had said that—

Q Is that the statement they read from?

MR. OATES: I object to that. That statement has not been introduced into Court.

\* \* \* \* \* \*

MR. OATES: I renew my objection that this statement has not been introduced in evidence and we object to any reading.

THE COURT: I will let the witness answer the question.

[PROSECUTOR]: Look at the statement—

MR. CAIN: We would also like to object to the fact that he says he will offer the statement of James Lee Graves in evidence. The [prosecutor] knows it is not admissible and that is an offer—

[PROSECUTOR]: Your Honor, I think at this point, that statement, since they have said

that that statement was the one that was read by him, I think the statement is admissible. We do not tender it at this time but I want that man to look at that statement, to read it, to do whatever he wants to and find all those details he put in his statement that he said was in that statement.

MR. OATES: Your Honor, also on direct he testified that he was given oral information from those police officers and that information he put in his statement did not come from James Graves' statement, it came from the officers.

[PROSECUTOR]: The Court Reporter can read it back that they read that statement to him.

THE COURT: That is my recollection. I overrule the objection.

[PROSECUTOR]: All right. Would you examine that statement, please?

\* \* \* \* \* \*

[PROSECUTOR]: Are you through looking at that?

A Yeah, I am through.

Q Is that the statement?

A I guess, because this is my first time seeing it.

Q All right.

A It could be changed for all I know.

Q *That part about Graves' suggesting that you go to Columbus Square and snatch some purses and you saying no, let's lay low because it is too hot or wait till things cool off, if that is not in this statement, then where did it come from?*

A That, I can't say, because I don't know.

Q *And if the part about going over, smoking marijuana is not true, then where did it come from?*

A The part about smoking the marijuana, that is—that was my idea about getting high, that was my idea, because I have already had some on me at that time.

Q All right. You are referring to that time, being when you were at the Graves' house?

A Right.

Q That was on the Monday morning after you went in and killed that woman and beat her mother, wasn't it?

A I guess it was.

(Emphasis added.)

That part about Graves' suggesting that you go to Columbus Square and snatch some purses and you saying, no, let's lay low because it is too hot or wait till things cool off, if that is not in his statement, where did that [detail in your signed statement] come from?

Bowden's counsel objected to this line of questioning on the ground that Graves' statement was not in evidence, and, moreover, was inadmissible. The prosecutor sought to avoid this objection by arguing that his questions were merely "hypothetical," that he was not trying to introduce Graves' statement into evidence. Bowden's counsel responded that the jury would nevertheless treat the hypothetical questions as containing Graves' statement. The court sustained Bowden's objection and instructed the prosecutor not to read from Graves' statement in questioning Bowden. Nevertheless, the prosecutor continued to preface his questions with obvious references to Graves' statement. After several of these questions were asked, and answered, Bowden's counsel again objected, asserting his previous ground that Graves' statement was not in evidence. The prosecutor, in response, reminded the court that Bowden was the one who had injected Graves' statement into the proceeding, by contending that his own confession was a coerced replication of that statement, and argued that Bowden ought not be permitted to use the inadmissibility of that statement to prevent the prosecutor from getting at the truth of that contention. This time the court overruled counsel's objection. The prosecutor thereupon gave Bowden a copy of Graves' signed statement and asked Bowden four more questions presumably dealing with differences between Graves' and Bowden's statements. See supra note 14. Bowden responded to those questions as he had to the earlier ones; he refused to admit that his statement contained information foreign to Graves' statement and that it had been the product of his own independent recollection. After this brief exchange, the prosecutor abandoned this line of cross-examination.

In his closing argument to the jury, the prosecutor refrained from mentioning the portion of his cross-examination of Bowden in which he had referred to the contents of Graves' statement. Thus, any prejudice to Bowden that may have flowed from these references was derived from the prosecutor's questions alone.

Bowden claims that the trial court, in allowing the prosecutor to allude to portions of Graves' statement during cross-examination, denied him the right to confront Graves in violation of the sixth and fourteenth amendments. Bowden did not make this argument to the trial judge; he argued only that Graves' statement had not been placed in evidence and that it was inadmissible. On direct appeal to the Georgia Supreme Court, Bowden claimed, apparently, that the admissibility of Graves' statement was foreclosed by the Georgia hearsay rule which states that "the confession of one joint offender or conspirator, made after the enterprise is ended, shall be admissible only against himself." Ga.Code Ann. § 38–414 (1978). The supreme court rejected Bowden's claim. Though Graves' statement had been uttered after the criminal enterprise at the Stryker residence had ended and thus would have constituted inadmissible hearsay under section 38–414 if offered to prove the truth of its contents, the court held it admissible, because Bowden, in his direct examination, had already introduced "the subject of the Graves' statement and said that [the police] officers had told him its content. He claimed that it was the sole source of his knowledge of the crime." *Bowden v. State*, 238 S.E.2d at 910. The court also added that the portions of Graves' statement utilized by the prosecutor were "relevant and material."

Graves' statement was clearly relevant. It bore directly on the critical issue of the detectives' and Bowden's credibility. If the statement was identical to or substantially the same as Bowden's, Bowden's assertions about the source of the words in his signed statement would become more plausible. However, if it was not, Bowden's asser-

tions would seem incredible and the detectives' assertions true. Graves' statement, when introduced on this issue of credibility and not to establish the truth of its contents, could not have constituted hearsay under the Georgia rule, section 38–414. For in this context the truthfulness of Graves' statement was not important. What was important was how Graves' statement compared with Bowden's.

There is no indication in the Georgia Supreme Court's opinion that suggests that Bowden contended, on appeal, that the trial judge, in allowing the prosecutor to proceed, denied him the right of confrontation. However, we do not have the benefit of Bowden's brief to that court on direct appeal,[15] so we cannot be certain that Bowden, in presenting his section 38–414 hearsay argument, did not also present a claim under the confrontation clause. We will, therefore, give him the benefit of the doubt and address the claim he now makes, considering it to have been presented to and disposed of on the merits by the Georgia Supreme Court.[16]

Bowden contends that he was denied the right to confront an accomplice, Graves, just as the petitioners were in *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), and *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Douglas,* the prosecutor called the petitioner's accomplice to the stand and, after the accomplice invoked the fifth amendment and refused to testify, read to him from his signed confession which implicated the petitioner, interspersing his reading with the question "did you make that statement?" The accomplice declined to answer. The petitioner objected, claiming a denial of confrontation. The Supreme Court, observing that although the prosecutor's reading of the statement was not testimony the jury may have considered it as such, concluded that the petitioner had been denied the right of confrontation. In *Bruton,* in a joint trial of the petitioner and his accomplice, the prosecutor introduced the accomplice's confession into evidence through the testimony of a postal inspector. The confession explicitly incriminated the petitioner. He objected, claiming a denial of confrontation. The district court cautioned the jury that the confession was admissible only against the accomplice. The court of appeals affirmed. *Evans v. United States,* 375 F.2d 355 (8th Cir.1967). On certiorari, the Supreme Court reversed. It found a denial of the right of confrontation notwithstanding the trial court's cautionary jury instruction.

We are not faced with the situation portrayed in *Douglas* and *Bruton.* In *Bruton,* the accomplice's confession was introduced against the accomplice to prove the truth of its contents; as against the petitioner, the confession was rank hearsay. Moreover, as the Court emphasized, this "hearsay statement inculpating petitioner was clearly inadmissible against him [for any purpose] under traditional rules of evidence. . . ." 391 U.S. at 128 n. 3, 88 S.Ct. at 1623 n. 3.

 In the instant case, the accomplice's statement was plainly relevant, and admissible as nonhearsay, with respect to the critical credibility issue in the petitioner's case, an issue that the petitioner, himself, injected into the trial.[17] Graves' state-

---

15. *See supra* note 8.

16. We note, in passing, that Bowden, in his first habeas petition to the Superior Court of Butts County, claimed that the prosecutor's use of Graves' statement during his cross-examination denied him "a fair trial" in violation of the Georgia Constitution, art. I, section 1, paragraph XI (Ga.Code Ann. § 2–111 (1978)). The superior court denied this claim, holding: "The Supreme Court of Georgia specifically addressed this contention upon direct appeal and rejected it. Accordingly, this habeas court cannot review this issue further. *See Bowden v. State,*

239 Ga. 821, 827(5), 238 S.E.2d 905 (1977)." *Bowden v. Zant,* 260 S.E.2d at 471 (appendix to the Georgia Supreme Court opinion). On appeal, the Georgia Supreme Court affirmed. *Id.* at 466. Bowden did not present this denial of fair trial claim as a federal due process claim in his habeas petition below, and it is not an issue in this appeal.

17. In this context, the contents of Graves' statement would not be offered for its truth. Therefore, it would not be hearsay. Nevertheless, the jury, especially in the absence of a limiting instruction, could use it for the truth of its

ment could have been placed in evidence in the State's rebuttal through the testimony of Detective Hardaway, who took the statement,[18] not to prove the truth of its contents but to prove who was telling the truth about the source of the words in Bowden's signed confession, Bowden or the detectives. The truthfulness of Graves' statement would not have been an issue; thus, the principal concern of the confrontation clause, the reliability of the out-of-court utterance sought to be introduced, would not have been implicated.

■ But the prosecutor did not choose this course. Instead, he chose to introduce portions of Graves' statement into evidence in the form of a preamble to questions he put to Bowden on cross-examination. In doing so, he denied Bowden the right to confront Hardaway. This denial did not operate to Bowden's prejudice, however. Bowden does not dispute that Graves gave Hardaway the statement in question or claim that the portions thereof the prosecutor used were stated incorrectly or out of context. He suggests nothing that he could have gained by cross-examining Hardaway on the subject.[19]

■ Even if we were to hold that the trial judge erred in a confrontation clause sense by allowing the prosecutor to cross-examine Bowden from Graves' statement, we would still reject Bowden's claim; for the error was harmless beyond a reasonable doubt. *See Schneble v. Florida*, 405

U.S. 427, 430–32, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972) (improper admission of codefendant's statement, harmless beyond a reasonable doubt). First, the evidence of Bowden's guilt was strong, if not overwhelming. Second, Bowden himself had already made the jury fully aware of Graves' statement and of the fact that that statement incriminated him, as well as Graves, in the Stryker crimes. Finally, the prosecutor made no mention of the objected to question in his closing argument to the jury.

### F.

Bowden's final claim is that his lead trial lawyer, Samuel Oates, rendered him ineffective assistance of counsel, in violation of the sixth and fourteenth amendments, in failing to conduct pretrial interviews of prosecution witnesses and in failing to discover and present evidence of Bowden's low intelligence in mitigation at the sentencing phase of the trial. Bowden raised this claim initially in his first habeas corpus petition to the Superior Court of Butts County. That court held an evidentiary hearing on the claim and denied it. Bowden claims that the record of that hearing discloses that Samuel Oates was ineffective as a matter of law. Bowden claims, alternatively, that, if Oates' ineffectiveness is not plain from the record, we should remand the issue to the district court for an evidentiary hearing so that his claim can be resolved.

contents, thereby prejudicing Bowden. It is a matter of common law, since embodied in Fed. R.Evid. 403, that the mere fact that a piece of evidence is prejudicial does not preclude its admission into evidence. The decision to admit it is within the discretion of the trial court and requires a balancing by the trial court of the probative value against the prejudicial effect. *See, e.g., United States v. Kennedy*, 291 F.2d 457, 459 (2nd Cir.1961) ("a trial court would have discretion to refuse such evidence where its usefulness ... was outweighed by its likely prejudicial effect on the jury, 31 C.J.S. Evidence, § 159.")

18. On rebuttal the prosecutor called Detective Hardaway and had him examine Graves' statement. He asked Hardaway whether certain details of Bowden's statement were present in

Graves' statement. Though Bowden objected to this mode of examination at trial on the same grounds as he objected to the prosecutor's earlier questions of him, Bowden has not made this objection the subject of a claim in these habeas corpus proceedings. We do note that in his closing argument to the jury at the conclusion of the guilt phase of the trial, Bowden's counsel admitted that the prosecutor's examination of Hardaway on rebuttal was relevant.

19. Hardaway was called to the stand by the prosecution both in its case in chief and in its rebuttal case. *See supra* note 18. He was subjected to cross-examination on both occasions. Naturally, he was available to the defense for cross-examination about the genuineness of Graves' statement as well.

■ The Butts County Superior Court conducted "a full and fair hearing" on Bowden's ineffective assistance claim, 28 U.S.C. § 2254(d) (1982), and the material facts were adequately developed. The court found those facts in its dispositive order, *Bowden v. Zant*, 260 S.E.2d at 470–71 (appendix to the Georgia Supreme Court opinion); accordingly, they "shall be presumed to be correct." 28 U.S.C. § 2254(d). *Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983) (footnote omitted).

Samuel Oates, as we have indicated, was Bowden's lead trial counsel. Four other lawyers assisted Oates in preparing and conducting Bowden's defense: D.L. Collins, Oates' law partner who specialized in criminal law; William S. Cain, also a criminal trial lawyer, who became the Public Defender sometime after Bowden was indicted; Frank Martin, a criminal law practitioner of considerable experience; and Millard Farmer, a specialist in death penalty cases. Oates, Collins and Cain were present in court during the trial. Oates, as lead counsel, cross-examined some of the State's witnesses and put on Bowden's defense. Collins and Cain also cross-examined some of the State's witnesses. Collins delivered Bowden's closing argument to the jury at the conclusion of the guilt phase of the trial. All of these attorneys participated in the preparation of the case for trial. Both Oates and Collins interviewed Bowden and handled the pretrial hearing on Bowden's motion for a psychiatric examination. Martin and Farmer acted as consultants, giving Oates technical advice on various procedural problems and trial strategy.

In preparing Bowden's defense for both the guilt and sentencing phases of the trial, Oates conferred with Bowden on eight or ten occasions and pursued all the leads Bowden gave him. Some, according to Bowden, were alibi witnesses. Oates interviewed them but declined to put them on the stand because they could not account for Bowden's whereabouts when the crimes were being committed. Some were character witnesses who Bowden apparently thought might be helpful, particularly on the sentencing issue. Oates interviewed them, also, but in a pure judgment call chose not to call them to testify. He felt that they would hurt Bowden's case more than they would help it.

■ The state habeas court found that Oates provided Bowden a reasonably effective defense in the guilt phase of the proceedings. The court observed that "there was no serious contention that another lawyer could have produced a different result on the question of guilt or innocence. In fact, [Bowden's] own expert witness testified that he did not think there was any substantial question of ineffectiveness on the part of trial counsel in the guilt/innocence phase of the trial." *Bowden v. Zant*, 260 S.E.2d at 471 (appendix to the Georgia Supreme Court opinion). The record fully supports this conclusion.

Oates examined the prosecutor's files and formulated a strategy which but for the fact that it failed could hardly be faulted. Oates used every legal device possible to exclude or discredit Bowden's highly damaging statements to the police. He succeeded in excluding one of them, apparently the most incriminating one, on constitutional grounds. Then, before the jury, he launched a vigorous and pointed cross-examination of the police interrogators, followed by a careful examination of Bowden, to establish a basis for a closing argument that the details of Bowden's confession had been furnished by the police.

■ Bowden's present counsel asserts that Oates failed to interview critical state witnesses.[20] We cannot determine in a vac-

---

**20.** Counsel asserts that:

Trial counsel never made any attempt to contact any of the following critical state's witnesses: John Weigal, Jr., the serologist from the state crime lab who identified blood on the pellet rifle seized from the home of appel-

lant's co-indictee; Benny Blankenship, the microanalyst from the state crime lab who identified hair similar to the victim's hair on the pellet rifle; Joe Weber, the pathologist who conducted the autopsy on the victim; Sammie Charles Robert, who purchased from appel-

uum whether a particular witness should have been interviewed or a particular inquiry made without first examining the likelihood that counsel's effort would have resulted in significant information useful to Bowden's defense. Bowden makes no proffer of what counsel would have discovered had he interviewed these witnesses, and nothing in the record indicates what he would have discovered. In fact, Bowden does not even suggest how counsel's failure to conduct these interviews prejudiced his case.

■ Turning to the sentencing phase of the case, Bowden contends that he is mentally deficient and that reasonably diligent defense counsel would have unearthed and presented more evidence of this in mitigation. Attorney Oates did present evidence, through Bowden's testimony, that Bowden had done poorly in school, finishing only the eighth or ninth grade, that much of his education had taken place in special education classes for slow learners, and that he was not able to read very well. Counsel also presented evidence that Bowden had left school because of a disagreement with his principal and that his mother had attempted to have a psychiatrist examine him several years earlier, apparently after he had gotten into trouble with the law.

Bowden contends Oates should have presented more evidence of this sort to the jury. For example, Oates should have established from readily available school records that Bowden had an I.Q. of fifty-nine; that he was easily distracted; that he had a tendency to act on impulse; and that a school psychologist had concluded after examining Bowden on November 14, 1966, that he was "not psychotic but definitely [had] several neurotic tendencies," and was "functioning within the lower limits of mild retardation." Bowden also contends that reasonably effective counsel would have introduced into evidence certain Goodwill Industries records which showed that he had been employed in Goodwill's sheltered employment program in a position from which he was dismissed for stealing and drug abuse. Bowden claims that this evidence, considered with the evidence Oates did adduce, would have been a persuasive mitigating factor at the sentencing phase of the proceedings and that counsel's failure to present it constituted ineffective assistance. We are not persuaded.

Counsel's argument to the jury explored Bowden's history of mental deficiency and the difficulties he had experienced both in and out of the schoolhouse during his formative years. It is true that counsel did not introduce and cite to the jury the record evidence that supported his argument. But such evidence, as the Georgia courts have noted,[21] would merely have been cumulative. The prosecutor never took issue before the jury with this defense line of argument. Moreover, the jury had ample opportunity to observe Bowden and no doubt drew the same conclusion about his mental state as it would have drawn had it been given the additional evidence now before us. In sum, there is no reason to believe that the jury on the basis of this additional evidence of Bowden's low intelligence would have recommended a different sentence. We conclude, as the Georgia courts have, that "Bowden's trial counsel

---

lant's co-indictee the television stolen from the victim; Brian Bouts, the crime lab director who was in charge of the physical evidence submitted for scientific analysis.

**21.** Bowden presented this additional evidence to the Muscogee County Superior Court in his extraordinary motion for a new trial. *See supra* text at 744–745. The court denied Bowden's motion, concluding that the proffered evidence was cumulative of that introduced by Bowden at trial. The court observed "that Bowden testified before the jury ... that he had been placed in special education classes in school and that

these classes were for people 'that were slow on learning and hard to learn and too hard to understand.'" The court also noted that Bowden's testimony consumed "approximately fifty pages of the trial transcript and that the jury had ample opportunity to observe Bowden, his mental condition and his intelligence as demonstrated by his ability to respond to questions and to express himself." On Bowden's appeal, the Supreme Court of Georgia affirmed. *Bowden v. State,* 250 Ga. 185, 296 S.E.2d 576, 577 (1982).

easily met the test of reasonably effective counsel." 260 S.E.2d at 466.

### III.

Since we find no constitutional basis for the issuance of the writ of habeas corpus in this case, the judgment of the district court is

AFFIRMED.