## 32163. BOWDEN v. THE STATE.

Hall, Justice.

Jerome Bowden was tried by a jury in the Superior Court of Muscogee County on December 7, 8, and 9, 1976

for murder, armed robbery, aggravated assault, and burglary occurring on October 11, 1976. He was convicted and sentenced to life for armed robbery, ten years and twenty years concurrently for aggravated assault and burglary, and death for murder. He is before this court on appeal and for mandatory review of the death sentence imposed.

## I. Summary of the Evidence

The state presented evidence from which the jury was entitled to find the following:

Mrs. Kathryn Stryker and her mother had not answered the door or telephone for several days. Their neighbors became alarmed and police were summoned. When Deputy Sheriff Samuel Profitt first entered the house on October 14, 1976 he noticed the ransacked rooms and then heard labored breathing. Profitt found Mrs. Wessie Jenkins, Mrs. Stryker's mother, lying on a bed in a pool of dried blood, still alive.

Sheriff Profitt then discovered the body of Kathryn Stryker in the kitchen. The victim's skull was beaten in, leaving her features unrecognizable; and a butcher knife was buried deep in her chest. An autopsy revealed that the base of the skull was fractured by the application of extreme force, such as is found in the victims of car accidents and plane crashes. There was also a large open wound behind the ear through which the doctor could see the brain. The knife wound had caused no bleeding, indicating that the victim was already dead when stabbed. Death had occurred three to four days earlier. A blow of great force by a nonsharp object had caused the injuries.

Mrs. Jenkins had suffered a stroke earlier in September, resulting in a partial paralysis that left her bedridden. After she was found on October 14, she was removed to a hospital where she became unconscious and died several weeks later. Mrs. Jenkins, when first admitted, had numerous injuries.

The police received information from one James Graves implicating appellant in the crime, and obtained a warrant for appellant. On October 15, 1976, appellant, who was informed that police were looking for him, turned himself in to an officer and was advised of his rights and

taken into custody. He made a statement at police headquarters, which was admitted into evidence at trial following a Jackson-Denno hearing. The statement arose spontaneously from a conversation between appellant and Detective Warren Myles as they sat in a police car while two other detectives were inside a house speaking to the girlfriend of James Graves, to whom they had been directed by appellant. The other two detectives, Hillhouse and Hardaway, then returned to the car and drove appellant back to headquarters. When appellant saw some jewelry that the police had found in a stove on the back porch of Graves' house, he exclaimed that it was what he had hidden in the stove.

In his detailed statement, appellant related that he and Graves, while raking Mrs. Stryker's yard one day, talked about burglarizing her home. Graves lived next door to her. Graves had been inside and had seen things he thought were valuable. The following Monday, armed with a pellet gun to knock anyone out who might interfere, appellant and Graves entered the house about 8:30 a.m., using a screwdriver to open the door. They surprised Mrs. Stryker in the kitchen and Graves hit her twice with the pellet gun, causing her to fall. Graves then unplugged a television and took it over to his yard. Meanwhile, appellant gathered together several pieces of jewelry that he found around the house. The appellant then asked the elderly Mrs. Jenkins the location of a gun in the house. When she would not tell him, the appellant hit her "five or six times" in the face.

The appellant further related how he and Graves searched the house, then left and went to Graves' house. They spent time "laughing and discussing" what they had done. When Graves suggested going to a shopping center and snatching purses, appellant advised him that they should "lay low" for awhile.

After making this statement, appellant additionally stated that he hit Mrs. Stryker twice and then, to "put her out of her misery," stabbed her once with a butcher knife from a drawer. When they returned to Graves' house, they threw wigs they had worn into the trash can and hid the jewelry in the stove. Appellant said Graves later sold the television to a Sammie Robertson and received a partial

payment of $10. Graves also sold some coins belonging to the victims.

A wig was found on a couch in Graves' house. Jewelry found by police in the stove included a piece with Mrs. Stryker's name on it, and a pin which was identified as having belonged to Mrs. Jenkins. A pellet gun was found under Graves' house.

Sammie Robertson testified that he received a television set from Graves and gave him $10. This television was seized by police and the model and serial numbers were compared with the numbers on an order form at a repair shop where Mrs. Stryker had ordered some knobs for her television. The numbers matched. The operator of a coin shop stated that he bought some old coins from Graves on October 11.

A strand of hair on the pellet gun was compared with Mrs. Stryker's hair and found to be similar. There were no dissimilar characteristics.

Appellant testified in his own behalf as follows:

He turned himself in to the police and told them he did not participate in the crime. He was questioned by Myles about the crime while they were in the car alone and decided to confess because Myles told him he could keep appellant from getting a death sentence. Appellant knew about the crime because police read him a statement made by Graves while appellant was interrogated. Appellant denied killing Mrs. Stryker and said he confessed because he was afraid. He testified that he did smoke marijuana as he had said in his statement. The district attorney asked if he had smoked the marijuana on the Monday morning "after you went in and killed that woman and beat her mother" and appellant replied, "I guess it was." The defense sought to show he misunderstood the question.

The state recalled witnesses to rebut appellant's testimony that his confession was induced by promises.

## II. Enumerations of Error

1. In appellant's first four enumerations of error he asserts the so-called "general grounds." We have reviewed the evidence summarized above, and conclude that the verdict was amply supported by the evidence and was not contrary to law and equity. Enumeration 2 argues

the weight of the evidence; this court considers only its sufficiency, *Ridley v. State,* 236 Ga. 147 (223 SE2d 131) (1976).

Appellant's assertion that the penalty of death is excessive and disproportionate will be considered below in our sentence review.

The first four enumerations are otherwise without merit.

2. In Enumeration 5 appellant urges error in the admission of photographs depicting Mrs. Jenkins' wounds taken some two months after the assault. The medical evidence was that the wounds when photographed were in the healing state, but were not yet completely healed. Appellant does not challenge the accuracy or materiality of the photos, but argues that the prosecution should have had other "less ghastly" photos which could have been used with less prejudice to him.

Appellant does not purport to know whether the prosecution possessed "less ghastly" photos. He offers his opinion that the prosecution in the exercise of good police practice *should* have taken photos earlier, and he assumes without apparent support that such photos would have been less ghastly. This enumeration of error is frivolous; the state is not required to assemble its case in the fashion least damaging to appellant. "There is abundant case authority that photographs showing an accurate and correct representation of a person or an object material to the issues in the case are admissible. . . . *[P]hotographs should not be excluded simply because there is other evidence of the location of the wounds.* To rule otherwise would unfairly preclude the state from establishing a material fact by more than one source of evidence. See *Johnson v. State,* 226 Ga. 511 (2) (175 SE2d 840); *Henderson v. State,* 227 Ga. 68 (5) (179 SE2d 76); *Sirmans v. State,* 229 Ga. 743 (1) (194 SE2d 476); *Coffee v. State,* 230 Ga. 123 (5) (195 SE2d 897); *Allen v. State,* 231 Ga. 17 (5) (200 SE2d 106)." *Floyd v. State,* 233 Ga. 280, 283 (210 SE2d 810) (1974). (Emphasis supplied.)

The mere fact that photos were taken some time after the infliction of the wounds they depict does not affect their admissibility. *Thompkins v. State,* 222 Ga. 420 (151 SE2d 153) (1966); *Anderson v. State,* 206 Ga. 527 (57 SE2d

563) (1950).

3. In Enumeration 6, appellant alleges error in overruling his objection to the opinion testimony of Blankenship, the state's witness regarding analysis of hair samples. He attacks the qualification of the witness and not the relevancy or materiality of the evidence.

The witness was employed by the Georgia Crime Laboratory as a microanalyst. He held a bachelor of science degree in chemistry from Georgia Southwestern College, certificate of graduation from Florida Tech University, and a crime investigation certificate of graduation from the FBI Academy at Quantico, Virginia. He had approximately one and one-half years of on-the-job training at the headquarters lab of the Georgia Crime Laboratory in Atlanta, Georgia, and training in trace evidence which includes hair comparisons in a one and one-half year period, and had testified as an expert witness regarding those comparisons.

Appellant contends that on-the-job training is insufficient to qualify one as an expert in the field of hair analysis.

To qualify as an expert (see Code § 38-1710), generally all that is required is that a person must have been educated in a particular skill or profession; his special knowledge may be derived from experience as well as study. *Carter v. Marble Products,* 179 Ga. 122 (175 SE 480) (1934); *Martin v. Newton,* 129 Ga. App. 735 (201 SE2d 31) (1973). Formal education in the subject at hand is not a prerequisite for expert status. Whether one qualifies as an expert lies within the trial court's discretion. E.g., *Barrow v. State,* 235 Ga. 635, 639 (221 SE2d 416) (1975); *Watson v. State,* 137 Ga. App. 530, 532 (224 SE2d 446) (1976). Appellant has shown no abuse of his discretion by the trial judge in permitting this witness to testify.

4. In Enumeration 7, appellant alleges error in the admission of testimony by the state's fingerprint expert. It is difficult to understand appellant's objection here. Sergeant Florence testified that he found no fingerprints at all inside the house, and he attributed that fact to the 80-degree temperature which, he opined, dried out in a matter of hours the moisture required to hold prints.

Appellant argues that Sergeant Florence was not shown to be an expert in moisture evaporation.

Our discussion of Enumeration 6 is applicable here. The qualifications of the witness were that he was an identification technician for the Columbus Police Department, working primarily in photography and fingerprint identification. He had been working with fingerprints for eight years. His schooling included three years of college; three two-week fingerprint seminars at Atlanta Police Academy; a one-week course at Sirchie Fingerprint Laboratory in Morristown, New Jersey; and in-service training in the Columbus Police Department.

We find no abuse of discretion by the trial judge in permitting the witness to testify in response to the prosecution's questions including those concerning degrees of moisture, how long moisture will or will not last, and the effect of temperature on moisture. Enumeration 7 is without merit.

5. In Enumerations 8 and 9 appellant alleges the trial court erred in overruling his objection to references on cross examination to the content of a written statement given by his co-offender, James Graves. Appellant contends that the prosecutor's actions in framing hypothetical questions to him based on the Graves statement, and in holding in the jury's presence a paper purporting to be the Graves statement, amounted to reading the Graves statement into evidence in violation of Code Ann. § 38-414 which specifies that the confession of one joint offender is admissible only against himself.

We note that on direct examination the appellant himself introduced the subject of the Graves statement and said that officers had told him its content. He claimed that it was the sole source of his knowledge of the crime. The prosecution then attempted to show that appellant's knowledge of the facts of the crime as revealed by his own statements was different from or more detailed than the statement which he claimed was his sole source of information.

This is a portion of the trial transcript: "Q. Then if the statement of Graves does not say how that house was entered, somebody is not telling the truth, is that correct?

A. That is true. Q. And if the statement of Graves should say — Mr. Oates: Your Honor, before he goes into this, now, am I to understand that you are reading from the statement of Graves? Mr. Pullen: I am not reading anything. I am asking him a hypothetical question, if it should say. He is on cross-examination, your Honor. The Court: All right. I will allow you to proceed. Mr. Oates: We will object to any reading of the statement. Mr. Pullen: I am not reading the statement. The Court: Yes, sir. I sustain the objection with respect to any reading of the statement. Mr. Pullen: I don't intend to, Your Honor. If the statement of Graves should state that you snuck in and hit Mrs. Stryker on the back of the head while she was looking the other way, where did this part about her coming out and looking up and saying, 'Oh my God, Jamie,' where did that come from?"

Appellant was also asked on cross examination, "Q. And if James Lee Graves, in his statement, never mentioned anything about going in the house about 8:00 or 8:30 in the morning, where did that come from? A. That, I don't know, because it was read from James Graves' statement by one of the detectives that he said that."

These matters being relevant and material, and having been first introduced into evidence by the testimony of appellant on direct examination, the trial court did not err in refusing to restrict the prosecution's "thorough and sifting" cross examination. Code Ann. § 38-1705; *Clifton v. State,* 187 Ga. 502, 508 (2 SE2d 102) (1939). Appellant emphasizes that he did not testify that the statement had ever been read in its entirety to him, but said only that officers had told him certain facts related in it. We note, however, that the record shows that appellant did testify at least three times that Detective Hillhouse read to him from the statement.

6. In appellant's final enumeration of error he alleges "The trial court erred in the imposition of the death penalty by finding that the murder was committed during the commission of burglary." Appellant's argument is ambiguous, but appears to claim that there was inadequate evidence in the record to support a finding of burglary of the victim's home. We find the evidence adequate, and the enumeration without merit.

### III. Sentence Review

We have reviewed the sentence as required by Ga. L. 1973, p. 159 et seq. (Code Ann. § 27-2537 (c) (1-3)) as we have in each case involving a death penalty under this statute, considering the aggravating circumstances found by the jury and the evidence concerning the crime. We conclude that the sentence of death imposed on Jerome Bowden was not imposed under the influence of passion, prejudice or any other arbitrary factor.

The jury found as statutory aggravating circumstances: "1. The offense of murder was committed while the offender was in the commission of another capital felony, to wit: armed robbery." Code Ann. § 27-2534.1 (b) (2) and, "2. The offense of murder was committed while the offender was engaged in the commission of burglary." Code Ann. § 27-2534.1 (b) (2).

The evidence supports the jury's findings.

With respect to the use of armed robbery as an aggravating circumstance of a capital felony under Code § 27-2534.1, we note that in *Collins v. State,* 239 Ga. 400 (— SE2d —) (1977) this court applied the rationale of *Coker v. Georgia,* 433 U. S.— (97 SC 2861, 53 LE2d 982)(1977) to armed robbery and kidnapping, holding that death may not be imposed for these crimes. This raises the question whether armed robbery remains a "capital felony" for aggravation purposes, and we recently answered that question in *Peek v. State,* 239 Ga. 422, 432 (1977): "We construe 'capital felony' as that term is used in § 27-2534.1 (b) (2) in a generic sense to include those felonies which were capital crimes in Georgia at the time this section of our death penalty statute was enacted." Thus, armed robbery remains a viable aggravating circumstance.

The evidence showed a planned invasion of the home of the victim and her elderly mother, conceived by appellant and his juvenile companion while in their employ. The two entered the victim's home armed with a pellet gun "to knock anyone out who might interfere" and Bowden viciously beat and stabbed Mrs. Stryker to death and beat her invalid mother so badly the injuries were evident for weeks afterward. Jerome Bowden's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering both the

crime and the defendant. The fact that appellant turned himself in to officers after learning that they were looking for him in connection with this murder, is urged to mean that death is a disproportionate penalty. This argument is without merit.

In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed, and we find the similar cases listed in the appendix support affirmance of the death penalty.

*Judgment affirmed. All the Justices concur.*

ARGUED APRIL 13, 1977 — DECIDED OCTOBER 18, 1977.

*Schumacher, Collins & Oates, Samuel W. Oates, Jr.,* for appellant.

*E. Mullins Whisnant, District Attorney, Lovick Anthony, Assistant District Attorney, Arthur K. Bolton, Attorney General, B. Dean Grindle, Assistant Attorney General, Susan V. Boleyn, Staff Assistant Attorney General,* for appellee.

APPENDIX.

*Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1974); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974); *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975); *Coleman v. State,* 237 Ga. 84 (226 SE2d 911) (1976); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Gibson v. State,* 236 Ga. 874 (226 SE2d 63) (1976); *Isaacs v. State,* 237 Ga. 105 (226 SE2d 922) (1976); *Dungee v. State,* 237 Ga. 218 (227 SE2d 746) (1976); *Pryor v. State,* 238 Ga. 698 (234 SE2d 918) (1977); *Gaddis v. State,* 239 Ga. 238 (236 SE2d 594) (1977); *Young v. State,* 239 Ga. 53 (236 SE2d 1) (1977).