## 41246. WALKER v. THE STATE.
(327 SE2d 475)

SMITH, Justice.

This is a death penalty case. Richard Walker was convicted in

---

Washington County of murder, burglary, and first degree arson. He was sentenced to death for the murder. The case is here on direct appeal, for review under the Unified Appeal Procedure (252 Ga. A-13 et seq.), and for the sentence review required by OCGA § 17-10-35.[1]

In late April of 1983, Walker's wife filed for divorce. When Walker was served with the divorce papers, he became very angry and upset and stated that he had to "get out of town . . . fast" or he would "do something bad." Walker told two co-workers that if his wife got custody of the kids, he would kill her.

On May 11, a temporary order was issued in the divorce case, awarding custody of the marital residence and the children to the wife. In addition, Walker was "restrained and enjoined" from going to his wife's residence and from "harassing or contacting her in any manner."

Notwithstanding this order, Walker called his wife several times on May 12. He told her he "hated her . . . guts." The calls ended around 11:30 p.m. Mrs. Walker put her two children to bed and locked the doors and windows.

Shortly before midnight, Walker arrived and demanded entry. He was refused, and he broke into the front door. Mrs. Walker heard something being poured onto the floor and smelled a strong odor of gasoline.

She ran across the hall to get her oldest son, Tony, but could not find him in the dark. As she ran to get her other son, she called to her husband, saying "please don't do it." Walker replied, "God damn it, it's too late now."

She heard a "whoosh," and soon the whole house was in flames. She threw her youngest son out the window and turned to get Tony, but the flames were too intense. She jumped out the window.

She had called her mother, Willie Mae Pearson, when Walker had first driven up. Mrs. Pearson lived nearby, and as she ran to the scene, she heard Tony saying: "[D]addy, please don't burn my momma. Leave my momma alone." Then the house was on fire. When she learned that Tony was still inside, she went in after him. Walker left the house just before she entered, his hands and arms on fire.

Mrs. Pearson located Tony and brought him outside. His night-clothes had burned off him, and strips of skin hung from his body.

Four-year-old Tony was taken to a special burn unit at Humana Hospital in Augusta with third-degree burns (i.e., the skin was totally destroyed) over virtually the entire surface area of his body. Despite

---

[1] The jury returned its verdict as to sentence on February 2, 1984. A motion for new trial was filed February 29, 1984, amended April 11, 1984, and denied April 19, 1984. A notice of appeal was duly filed and the case was docketed in this court June 14, 1984. The case was orally argued September 12, 1984.

efforts there and later at the Shrine Burn Institute in Galveston, Texas, Tony died 21 days later.

Walker's burns were serious enough that he went to a hospital for treatment. The treating physician noted a smell of gasoline on Walker, and treated him for first and second degree burns on his face, his arms, and the backs of his hands.

Expert testimony was offered that the fire was started in the kitchen area by means of a large quantity of flammable liquid thrown about the room and ignited by an open flame, and that the kind of flash burns that Walker received were consistent with his having started such a fire.

A small pair of shoes found in the kitchen area was sent to the crime lab for analysis which confirmed the presence of gasoline.

It was shown that in 1972, Walker had shot his former wife in the back six times, killing her.

1. The evidence was sufficient to support the jury's verdict of guilty on Count 1 (murder), Count 2 (arson in the first degree), and Count 3 (burglary). *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). However, Walker contends that since the jury was charged on both felony murder and malice murder and returned a verdict which did not specify which type of murder (malice or felony) it found, the verdict must be construed as a finding of felony murder, with the result that the underlying felony must be set aside.

The jury's verdict recited, in part, that it found Walker "guilty of Count 1 — murder."

Count 1 of the indictment alleged that Walker did "unlawfully and with malice aforethought cause the death of Antonio Darrell Thompson, a human being, by means of arson . . ."

The allegation that the murder was committed "by means of arson" was unnecessary to a charge of malice murder, and Count 1 therefore alleges both felony murder and malice murder.[2]

In these circumstances, the jury's verdict of "guilty of Count 1 — murder" was not an unambiguous finding of malice murder, and must be construed as one for felony murder, the underlying felony being that alleged in the indictment, i.e., arson. *Burke v. State*, 248 Ga. 124 (281 SE2d 607) (1981); *Blankenship v. State*, 247 Ga. 590 (2) (277 SE2d 505) (1981).

The general rule is that "[a] defendant may not be convicted law-

---

[2] OCGA § 16-5-1 (a) provides: "A person commits the offense of murder when he unlawfully and with malice aforethought causes the death of another human being."

OCGA § 16-5-1 (c) provides: "A person also commits the offense of murder when, in the commission of a felony, he causes the death of another human being irrespective of malice."

When an indictment alleges in one count two alternative bases for conviction, a verdict of guilty is appropriate if either is established. *Garmon v. State*, 219 Ga. 575 (2) (134 SE2d 796) (1964).

fully of felony murder *and* the underlying felony." *Stone v. State*, 253 Ga. 433, 434 (321 SE2d 723) (1984). See also *Harris v. Oklahoma*, 433 U. S. 682 (97 SC 2912, 53 LE2d 1054) (1977). The state argues that this rule is inapplicable here since the felony murder and the underlying felony were committed on different victims, citing *Satterfield v. State*, 248 Ga. 538 (285 SE2d 3) (1981). We disagree.

The rationale of *Satterfield* is not applicable to a case where, as here, "the count of the indictment alleging felony murder sets forth the underlying felony or felonies supporting the charge of felony murder." Id. at 541. Walker's 15th enumeration of error is meritorious, and his conviction on Count 2 must be reversed. *Bolton v. State*, 253 Ga. 116 (1) (318 SE2d 138) (1984).

2. In enumeration 16, Walker contends that the conviction of burglary must be set aside because in this case it is a lesser included offense as a matter of fact of the arson and the felony murder. We disagree, and find no merit to this enumeration of error. *Haynes v. State*, 249 Ga. 119 (2) (288 SE2d 185) (1982).

3. In his 17th enumeration, Walker complains of the admission in evidence at the guilt-phase of the trial that he had murdered his former wife in 1972. We find no error.

Both the prior incident and the crime on trial involved acts of violence by Walker towards his wives, stemming from marital difficulties. The prior incident was admissible to show malice, intent, motive and bent of mind. *Gentry v. State*, 250 Ga. 802 (1) (301 SE2d 273) (1983); *Burke v. State*, 250 Ga. 235 (297 SE2d 247) (1982).

4. Prior to trial, Walker moved for disclosure by the state of his parole file. This motion was denied, and in his first four enumerations of error, Walker complains of the court's denial of disclosure and the court's refusal to conduct an in-camera inspection of the file or to have the file sealed and preserved for appellate review. Walker further contends that OCGA § 42-9-53, on which the trial court relied to deny Walker's disclosure motion, is unconstitutional if it allows the suppression of exculpatory or potentially mitigating evidence in a death penalty case.

We need not resolve the constitutional question, since the trial court has now reviewed the parole file (which has been sealed and forwarded to this court for appellate review) and has found that the only evidence therein that was substantially exculpatory or potentially mitigating was either "known to defendant's counsel prior to trial, . . . or obtainable by defendant's counsel by other means."[3]

---

[3] Walker was convicted of murder in Florida in 1972. After he was paroled, he moved to Georgia and his parole was transferred here. At least some of the information contained in the Georgia parole file was obtained by Walker from the Florida system. Moreover, the psychologist who examined Walker obtained additional information from Georgia parole offi-

Therefore, the court found, any possible error in the non-disclosure of the file was harmless.

The court's five-page findings are supported by the record, and we find no reversible error here.

5. Prior to trial, Walker requested funds for an examination by a private psychiatrist. Absent any showing that an examination at Central State Hospital would be inadequate, the court refused the request for funds. However, based on Walker's contention of a need for an examination, the court ordered that an evaluation be conducted by Central State.[4]

Walker was examined for over three weeks at Central State by Dr. Gerald Lower. Besides personally observing and interviewing Walker, Dr. Lower talked to Walker's sister and to a deputy sheriff who knew Walker; he reviewed information which Walker's attorney had obtained from the Florida parole board, including previous mental evaluations conducted while Walker was in the Florida prison system; and he talked to several Georgia "parole officials."

Dr. Lower testified on behalf of the defense at the sentencing phase of the trial.

(a) In enumerations 5 and 6, Walker contends that the state failed to perform an adequate mental examination and that the court erred by refusing to grant funds for an examination by a private psychiatrist of Walker's own choosing.

Very recently, the United States Supreme Court addressed the question of psychiatric assistance for an indigent defendant, in an Oklahoma death penalty case. *Ake v. Oklahoma*, ___ U. S. ___ (105 SC 1087, ___ LE2d ___) (1985).

Prior to trial, Ake underwent an evaluation at a state mental hospital to determine his competence to stand trial. He was found to be incompetent. However, with treatment his condition improved and he was pronounced ready for trial. At this point, his attorney moved for a psychiatric evaluation addressing defendant's sanity at the time of the crime. This motion was denied. As a result, no expert examination was ever conducted on the issue of Ake's sanity, and there was no expert testimony on this issue at trial. The jury rejected his sanity defense and found him guilty.

The Supreme Court held that where a defendant can demonstrate that the issue of sanity will be a "significant factor" at trial, the

---

cials. See Division 5 of this opinion.

[4] On appeal, Walker points out that he never made a request for evaluation by state psychiatrists and alleges that the trial court stated its intention to send him to Central State whether he agreed or not. However, we do not so read the record. Moreover, we note that Walker's attorney was asked by the court whether he had any objections to such an examination and counsel responded that he had none.

state must provide an indigent defendant with expert assistance on this issue. The Court was careful to point out, however, that in this context, its holding did not mean "that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." Id. at 1097.

Next, the court addressed the question of expert assistance where the "state psychiatrist" called as a defense witness testified on cross-examination that "Ake posed a threat of continuing criminal violence." Id. at 1099. This testimony raised the issue of Ake's future dangerousness, which in Oklahoma, as in Texas, is a statutory aggravating factor on which the prosecutor relied at sentencing. Ibid. See *Jurek v. Texas*, 428 U. S. 262 (96 SC 2950, 49 LE2d 929) (1976).

The Supreme Court's treatment of this situation in *Ake* can best be understood in light of previous Supreme Court cases considering the use of psychiatric testimony on the issue of future dangerousness.

In *Estelle v. Smith*, 451 U. S. 454 (101 SC 1866, 68 LE2d 359) (1981), the Court, in the course of holding that a defendant could not be compelled to submit to a psychiatric evaluation of his future dangerousness (unless, perhaps, he presented expert testimony of his own on this issue — see id. at 466, fn. 10), noted that proof of a defendant's future dangerousness "does not require resort to medical experts." Id. at 473. A defendant's propensity, or lack thereof, to commit other violent acts may be established by examination of the defendant's "past criminal conduct, his age, and the circumstances surrounding the crime for which he is being sentenced." Id. at 472. Moreover, not only is expert testimony on this issue unnecessary, the court noted that many mental health professionals have questioned the usefulness of psychiatric predictions of future dangerousness and are of the view that "psychiatrists possess no special qualifications for making such forecasts." Ibid.

Subsequently, the Court reviewed a case in which the state had presented the testimony of two experts who testified in response to hypothetical questions that the defendant "would probably commit further acts of violence and represent a continuing threat to society." *Barefoot v. Estelle*, 463 U. S. 880 (103 SC 3383, 3389, 77 LE2d 1090) (1983). Barefoot claimed that such expert testimony should be constitutionally barred. The Court found no merit to this claim, notwithstanding "professional doubts about the usefulness of psychiatric predictions" of future dangerousness, inasmuch as not all professionals shared these doubts. Id. 103 SC at 3398 (fn. 7). This holding was clearly premised, however, on the assumption that the jury would have before it "the views of the State's psychiatrists *along with* opposing views of the defendant's doctors." Id. at 3397. (Emphasis supplied.) Doubts about the validity of psychiatric predictions could therefore "be called to the attention of the jury," id. at 3398 (fn. 7),

and "the adversary process [could] be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness." Id. at 3398.

In *Ake*, the only expert testimony regarding future dangerousness was elicited by the state from a psychiatrist employed by the state. The Supreme Court's holding that Ake was entitled to additional (and, presumably private) psychiatric assistance in this context was inevitable, given the Court's concerns about the reliability of such testimony, and the importance of placing before the jury opposing views on the question.

In Georgia, although the issue of future dangerousness is not irrelevant, see Division 14, ante, it has invariably been addressed by reference to the defendant's "past criminal conduct, his age, and the circumstances surrounding the crime for which he is being sentenced," (*Estelle v. Smith*, supra), and not by expert testimony predicting future behavior.

In this case, the state did not attempt to elicit from Dr. Lower a prediction of Walker's future dangerousness. We find no abuse of discretion in the court's refusal to provide private psychiatric assistance here, nor do we find that Walker was denied an adequate mental examination. *Finney v. State*, 253 Ga. 346 (1) (320 SE2d 147) (1984).

(b) In enumerations 7 and 8, Walker contends that since he is mentally ill, the death penalty imposed in this case is excessive and disproportionate. We disagree.

Walker presented medical testimony that he suffered from moderate depression and that as a result of personality disorders he did not "do well in close relationships with other people" and had a poor ability to handle pressure. This testimony hardly compels a finding that Walker suffered serious mental illness and, in fact, the jury found him to be neither insane nor mentally ill.

Walker's death penalty is not by reason of mental illness excessive or disproportionate. *Spivey v. State*, 253 Ga. 187 (20) (319 SE2d 420) (1984); *Waters v. State*, 248 Ga. 355 (18) (283 SE2d 238) (1981).

6. We find no error in the court's refusal to excuse a potential juror who was the wife of one of the members of the grand jury which returned the original indictment in this case.[5] This potential juror was not ineligible for trial jury duty, see OCGA § 15-12-4, nor was she otherwise disqualified for "principal cause." *Jordan v. State*, 247 Ga. 328 (6) (276 SE2d 224) (1981); OCGA § 15-12-163. In view of her answers on voir dire, the trial court was authorized to find that she could be a fair and impartial juror and the court did not err by refus-

---

[5] This indictment was quashed when the court found meritorious Walker's challenge to the array of the grand jury. An entirely new grand jury returned the indictment on which the case was tried.

ing to grant Walker's challenge for favor. *Jordan v. State*, supra.

7. In his 10th enumeration, Walker complains of the court's refusal to excuse three potential jurors who, he contends, had fixed opinions in favor of the death penalty.

We note that Walker's attorney withdrew his initial objections to two of the jurors after they were extensively examined by both parties.[6]

As to the remaining juror, the trial court found that "he would not automatically vote for the death penalty in this case [and that] [h]e would review what the court charges and follow the law."

The court's findings are supported by the record and the court did not err by refusing to excuse the juror. *Wainwright v. Witt*, ___ U. S. ___ (105 SC 844, 83 LE2d 841) (1985); *Godfrey v. Francis*, 251 Ga. 652 (11) (308 SE2d 806) (1983).

8. The trial court did not err by granting the state's challenges to two prospective jurors with conscientious objections to the death penalty. The record supports the trial court's finding that neither of the two jurors would be able to vote for the death penalty no matter what the evidence. *Wainwright v. Witt*, supra; *Spivey v. State*, supra, 253 Ga. at 197 (n. 3). Walker's 11th enumeration is without merit.

9. After the jury reached a verdict as to sentence, the trial court conducted an extensive poll of the jury regarding its findings. One of the questions asked was whether each juror understood that despite the finding of three statutory aggravating circumstances, the death penalty did not have to be imposed.

The first juror polled stated that she did not understand the question. After several attempts at clarification, the trial court moved on to the other jurors, who all understood that they were not required to impose the death penalty simply because they had found three statutory aggravating circumstances.

Finally, the court returned to the first juror who stated that she now understood the question and affirmed that she had voted for the death penalty after having found the requisite aggravating circumstances, knowing that she nonetheless had the option to vote for life.

We find no merit to Walker's 12th enumeration, in which he contends that the trial court erroneously accepted a death sentence from a jury in which one of the members felt that she had no choice but to impose a death sentence.

10. The court did not err by failing to advise Walker that he had a right to make an unsworn statement at the sentencing phase of the trial.

A defendant has a right to testify in his own behalf, subject to

---

[6] Transcript, Vol. I, pp. 88-94.

cross-examination. OCGA § 24-9-20. He is not entitled to make an unsworn statement. Ga. Laws 1973, p. 292.

Walker's 13th enumeration is without merit.

11. The court did not err by omitting to tell the jury that it could impose a life sentence consecutive to or concurrent with the life sentence he was already serving in Florida. *Spivey v. State*, supra, 253 Ga. at 191-193.

Walker's 14th enumeration is without merit.

12. We find no merit to Walker's contention that the practice of "death-qualification" of jurors is unconstitutional. *Wainwright v. Witt*, supra; *Mincey v. State*, 251 Ga. 255 (2) (304 SE2d 882) (1983). Nor do we agree that this state's death penalty law has been administered in a constitutionally deficient manner.

Walker's 22nd, 24th, and 25th enumerations are without merit.

13. Walker has failed to show that excusing women with children under the age of 14, pursuant to former OCGA § 15-12-1 (b), resulted in the substantial underrepresentation of cognizable groups on Washington County jury venires generally or on his venire. *Ingram v. State*, 253 Ga. 622, 630 (1 e) (323 SE2d 801) (1984). Therefore, his 23rd enumeration is meritless. *Duren v. Missouri*, 439 U. S. 357 (99 SC 664, 58 LE2d 579) (1979).

14. During his closing argument at the sentencing phase of the trial, the prosecutor emphasized the fact that Walker had been previously convicted of murder. He argued:

"What is more reasonable than to say that twice is too much. Isn't once enough, but is twice too much? . . .

"Why is there a death penalty at all? If it is justice at any point, it is justice now. How many lives must be lost before justice can be achieved? How many people must die before we say no more, that's it. No more lives are going to be taken by you, Mr. Walker. How is it not justice to take from him what he has taken from two citizens, two citizens, how is it not justice?

"This case will serve as a signal to people who know and read and hear about this case, of what Washington County sees as justice. It will serve as a signal no matter what your verdict is, that this man has killed twice and what is justice in Washington County? Your verdict will speak either way. Will we tolerate this in Washington County or is two enough here? Will we allow our children to be burned to death by people who have committed murder before and will that be tolerated by the citizens of this county? And what type of justice do we have in this society?"

Walker did not object to any of the foregoing at trial. However, in his 18th enumeration of error, he contends that the prosecutor's argument that Walker would kill again if given a life sentence was improper, and that the prosecutor improperly pressured the jury into

reaching a verdict of death by reminding the jury that its verdict would "serve as a signal."

In view of the lack of any contemporaneous objection to the prosecutor's argument, we need not determine whether the argument was free from all possible objection, nor must we vacate the sentence if the prosecutor's argument fails to meet our unqualified approval. See *Williams v. State*, 250 Ga. 553 (5) (300 SE2d 301) (1983). As we have previously observed, that our statutorily mandated sentence review includes review of closing arguments (see *Gilreath v. State*, 247 Ga. 814 (15) (279 SE2d 650) (1981)) "does not . . . require that we reverse a death penalty simply because some portion of the closing argument might have been subject to some objection never made." *Spivey v. State*, supra, 253 Ga. at 191. Absent any such objection, we only determine if the prosecutor's argument was so prejudicial or offensive, or involved such egregious misconduct on the part of the prosecutor that the jury's verdict was impermissibly influenced by passion, prejudice or other arbitrary factor. *Ross v. State*, 254 Ga. 22 (7) (326 SE2d 194) (1985); *Spivey v. State*, supra. Compare *United States v. Young*, ___ U. S. ___ (105 SC 1038, ___ LE2d ___) (1985).

In making this determination, we must be mindful of the differences between sentencing hearings and proceedings to determine guilt or innocence. In determining sentence, the jury considers different kinds of issues, and performs distinctly different duties, than it does in determining guilt. Therefore, limitations on argument entirely appropriate to the guilt phase of a trial cannot be applied mechanistically to the sentencing phase.

For example, it is generally accepted that in a proceeding to determine guilt a "prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." *United States v. Young*, supra at 1042 (fn. 3) (quoting ABA Standards for Criminal Justice 3-5.8 (d) (2d ed. 1980)).

Obviously, at the sentencing phase of a death penalty case, a jury is entitled to consider issues broader than a defendant's guilt or innocence, and a prosecutor must therefore be entitled to present argument on these broader issues.

Less obvious, perhaps, but nonetheless inevitably true upon careful consideration, is that given the nature of the sentencing determination, it makes no sense to preclude all argument as to the possible consequences of the jury's sentencing verdict.

"Under the sentencing model employed by Georgia in capital cases the jury is given the task, subject to full Georgia Supreme Court review, of fashioning state sentencing policy. In discharging this task,

the jury functions as a fact finder in determining the presence of aggravating and mitigating circumstances, but acts as a policy maker in determining whether a sentence of death or life imprisonment should be imposed . . . [Once the jury determines that statutory aggravating circumstances are present, it is authorized, but not required, to impose a death sentence. At this point,] [t]he jury is no longer being asked to determine what has taken place, but rather what justice demands that society perform in response." *Collins v. Francis*, 728 F2d 1322, 1340 (11th Cir. 1984). In performing this function, the jury cannot ignore possible consequences of its verdict.

Thus, we have held that whether a defendant might kill again if given a chance, or, in other words, whether his "probable future behavior indicates a need for the most effective means of incapacitation, i.e., the death penalty," is a matter which the jury may properly be invited to consider. *Ross v. State*, 254 Ga., supra at 34; *Jurek v. Texas*, 428 U. S. 262 (96 SC 2950, 49 LE2d 929) (1976). In this case, the prosecutor's arguments in this vein were neither irrelevant nor out of place.

Other portions of the prosecutor's argument invoked considerations of retribution and general deterrence, both of which are "valid penological justifications for the imposition of the death penalty." *Conner v. State*, 251 Ga. 113, 122 (5) (303 SE2d 266) (1983). That a jury's verdict will be noted in the community, will speak on behalf of the community, and will "serve as a signal" to the community are matters which are obviously true. See *Horton v. State*, 249 Ga. 871, 876 (295 SE2d 281) (1982). It is precisely this notice on which depends any possible general deterrent effect resulting from the imposition of a death sentence. And it is by rendering a verdict which speaks on behalf of the community that the jury channels the community's "instinct for retribution" by expressing "society's moral outrage at particularly offensive conduct." *Conner v. State*, supra at 120 (quoting *Gregg v. Georgia*, 428 U. S. 153, 184 (96 SC 2909, 49 LE2d 859) (1976)).

Of course, in most murder cases, considerations of neither general deterrence nor retribution will demand the imposition of the death penalty. And in the overwhelming majority of murder cases, the death penalty is not imposed. But that is not to say that a prosecutor may not urge vigorously that a death sentence *is* appropriate punishment in the case at hand, or that in so doing he may not remind the jury of the retributive and general deterrent functions of its verdict.

We note that the right of "open and far-ranging argument" (*Gregg v. Georgia*, supra, 428 U. S. at 203), belongs to both parties — defendants also have the right to argue, and on the issue of sentence, the defendant always has the *final* closing argument. OCGA § 17-10-2. See *Beck v. State*, 254 Ga. 51 (14) (326 SE2d 465) (1985) (reversing

the death sentence where the defendant was denied his right to make the final closing argument).

For the foregoing reasons, we conclude that the prosecutor's argument in this case was not so egregiously improper as to require reversal of Walker's death sentence despite the lack of timely objection.

15. We find that the state's cross-examination of Walker's former parole officer concerning testimony given during the direct examination was not improper. We therefore find no merit to Walker's 19th enumeration of error.

16. In his 21st enumeration, Walker relies upon *Enmund v. Florida*, 458 U. S. 782 (102 SC 3368, 73 LE2d 1140) (1982) to argue that his death penalty is excessive and disproportionate.

"*Enmund* holds that the Eighth Amendment forbids the imposition of the death penalty upon a defendant 'who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' " *Allen v. State*, 253 Ga. 390, 395 (7) (321 SE2d 710) (1984) (quoting *Enmund*).

Walker did not aid and abet a felony — he directly committed it. Furthermore, the murder here was not committed by others — Walker himself committed murder. Finally, not only did Walker "himself kill," but he clearly intended that lethal force would be employed.

This enumeration is without merit.

17. The jury found three statutory aggravating circumstances: "(1) The offense of murder . . . was committed by an accused with a prior record of conviction for a capital felony . . . [specified in the verdict as the 1972 murder of his former wife]; (2) The offense of murder . . . was committed by Richard Walker while the defendant was engaged in the commission of . . . arson in the first degree; (3) The offense of murder . . . was committed by Richard Walker while the defendant was engaged in the commission of the offense . . . of burglary." See OCGA §§ 17-10-30 (b) (1) and (b) (2). These findings are supported by the evidence beyond a reasonable doubt. OCGA § 17-10-30 (c); OCGA § 17-10-35 (c) (2).

18. We find that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). Walker's 20th enumeration is without merit.

19. Walker, having once previously committed murder, broke into a home he had been ordered to stay away from and burned to death an innocent 4-year-old boy who pleaded with him not to start the fire. We find that the sentence of death imposed in this case is neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The cases listed in the Appendix support the imposition of the

death penalty in this case.

*The conviction for arson in the first degree is reversed. The remaining convictions are affirmed. The death sentence is affirmed. All the Justices concur, except Weltner, J., who dissents as to Division 1 and the judgment reversing the conviction for arson in the first degree.*

APPENDIX.

*Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Castell v. State*, 250 Ga. 776 (301 SE2d 234) (1983); *Williams v. State*, 250 Ga. 553 (300 SE2d 301) (1983); *Horton v. State*, 249 Ga. 871 (295 SE2d 281) (1982); *Davis v. State*, 241 Ga. 376 (247 SE2d 45) (1978); *Bowden v. State*, 239 Ga. 821 (238 SE2d 905) (1977); *Stephens v. State*, 237 Ga. 259 (227 SE2d 261) (1976); *Spencer v. State*, 236 Ga. 697 (224 SE2d 910) (1976); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975).

HILL, Chief Justice, concurring.

I concur in the majority opinion and judgment. I write to elaborate on Division 1 of the majority opinion.

This is at least the sixth (6th) time since 1977 that this court has reversed a conviction for an underlying felony where the jury's verdict was unclear as to whether the jury found the defendant guilty of murder with malice aforethought or felony murder. *Reed v. State*, 238 Ga. 457 (7) (233 SE2d 369) (1977); *Casper v. State*, 244 Ga. 689 (7) (261 SE2d 629) (1979); *Dampier v. State*, 245 Ga. 427 (13) (265 SE2d 565) (1980); *Burke v. State*, 248 Ga. 124 (1) (281 SE2d 607) (1981); *Dillard v. State*, 251 Ga. 858, fn. 1 (310 SE2d 518) (1984); see OCGA § 16-5-1 (a) (c).

As Justice Weltner pointed out in *Dillard v. State*, supra, when a judge charges a jury on malice murder and on felony murder, the judge should instruct the jury to make its verdict clear by finding the defendant "guilty of murder with malice aforethought," or "guilty of felony murder" (or "not guilty").

If the jury does not return a verdict clearly distinguishing between malice murder or felony murder, the jury should be recharged and required to make its verdict clear.

WELTNER, Justice, concurring in part; dissenting in part.

I dissent as to the holding in Division 1 of the majority opinion, and to so much of the judgment as works reversal in part.

In *Stone v. State*, 253 Ga. 433 (321 SE2d 723) (1984), we considered a similar problem. There, a defendant was indicted for murder and another crime. The jury was instructed as to malice murder and felony murder. The verdict was "guilty on both counts."

"When a verdict is unclear as to which type of murder (malice or felony) is found, a defendant is deemed guilty of the lesser offense of felony murder. *Burke v. State*, 248 Ga. 124 (281 SE2d 607) (1981). In this case, however, because Count 1 of the indictment charged only malice murder, and the jury returned a verdict of guilty on *that count*, there is no ambiguity. Accordingly, Stone was convicted of malice murder." 253 Ga. at 434.

In this case, the verdict was "guilty of Count 1— murder." If anything, this verdict is *less* ambiguous than the verdict we affirmed in *Stone*.

Accordingly, I would affirm all of the convictions, as well as the sentence.

DECIDED MARCH 14, 1985 —
REHEARING DENIED MARCH 28, 1985.

*Kenneth D. Kondritzer*, for appellant.
*Richard A. Malone*, District Attorney, *Michael J. Bowers*, Attorney General, *Eddie Snelling, Jr.*, for appellee.